# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 10-144-02 |
| | ) | (Civil No. 15-1168) |
| **LEWIS WHOOLERY,** | ) | |
| | ) | |
| | ) | |

## OPINION

**CONTI, Chief U.S. District Judge.**

### I. Introduction

Petitioner Lewis Whoolery ("Whoolery") filed a motion to vacate, set aside, or correct sentence by a person in federal custody pursuant to 28 U.S.C. § 2255 (the "§ 2255 motion") on September 8, 2015. (ECF No. 352.) In the three months following the filing of his § 2255 motion, Whoolery filed six motions seeking relief related to this motion, including two motions for summary judgment, two motions seeking entry of default judgment, and motions for expedited review, immediate release, appointment of counsel, and an evidentiary hearing. (ECF Nos. 357, 367, 370, 380, 381, 382.) The court ruled upon these motions, or deferred their consideration in several written opinions and orders (ECF Nos. 378, 385, 389), prompting Whoolery to file two motions for reconsideration, which are pending (ECF Nos. 390-91). For the reasons set forth in this opinion, the § 2255 motion will be denied in all respects because all claims raised by Whoolery lack

merit.  A hearing is not required on the motion because the motion and records of the case show conclusively that Whoolery is not entitled to relief.  The two pending motions for reconsideration will likewise be denied.

## II. Procedural Background

On July 27, 2010, a federal grand jury returned a one-count indictment against Whoolery and his sister, Kimberly Baldwin ("Baldwin").[1] (ECF No. 1.)  Whoolery owned and operated First Capital Home Equity ("First Capital"), a mortgage brokerage firm, and Baldwin worked at the firm during the pertinent time period.  The indictment charged Whoolery  and Baldwin with one count of conspiracy to commit wire fraud from in and around January 2003 and continuing to in and around November 2006 in violation of 18 U.S.C. § 1349. (Id.)  On October 25, 2011, a federal grand jury returned a one-count superseding indictment charging Whoolery and Jason Sheraw with the same crime. (ECF No. 46.)  Baldwin and several other individuals were listed in the superseding indictment as unindicted coconspirators. (Id. at 1-2.)  Many of the coconspirators listed in the indictments testified on behalf of the government at Whoolery's trial. (ECF Nos. 1, 46, 155 at 2.)

_____

[1] In his § 2255 motion, Whoolery discusses an incident that occurred in the fall of 2004 between Kimberly Baldwin's husband, Barry Baldwin, and himself at his father's hunting camp.  When this matter is discussed, and at other relevant times, the court will delineate between Kimberly Baldwin and Barry Baldwin by using both their first and last names.  Otherwise, references to "Baldwin" in this opinion are to Kimberly Baldwin, Whoolery's sister and coconspirator.

Both Baldwin and Sheraw pleaded guilty to the charged wire fraud conspiracy. (ECF Nos. 59, 143.)  Whoolery persisted in his plea of not guilty and his case proceeded to trial.  Baldwin testified on behalf of the government, as did thirty other witnesses, including nearly a dozen members of the conspiracy, other employees of First Capital, individual borrowers, and representatives from lenders for whom First Capital brokered loans. (ECF No. 155.)  Hundreds of pieces of documentary evidence were offered into the record. (ECF No. 156-2.)

The government established at trial that Whoolery, through First Capital, directed a mortgage fraud scheme pursuant to which unlicensed individuals prepared real estate appraisals that purposefully inflated the fair market value of a property and included falsified information about the size or location of the property, the applicability of comparable properties, and the visual appearance of the property, among other things. Some of the unlicensed individuals who prepared fraudulent appraisals on behalf of First Capital were Kenneth Cowden ("Cowden") and Baldwin. United States v. Whoolery, 579 F. App'x 78, 80 (3d Cir. 2014) (Whoolery I).  Whoolery paid licensed real estate appraisers for permission to use their licensure credentials, signatures, and insurance information to submit these fraudulent appraisals to lender banks.  Some of the licensed appraisers who were paid in exchange for the use of their licenses were Jeanette Gray ("Gray") and Jason Sheraw ("Sheraw").  The scheme also included fabricating or altering income and asset statements to make First Capital's borrower customers appear more financially attractive to lender banks. Id.  The scheme increased the chance that a loan

3

would be approved and funded by a lender bank so that First Capital could earn the fees associated with brokering the loan. Id. Whoolery received half of all fees earned by any individual who brokered loans at First Capital, and more than half if he brokered the loan himself. (ECF No. 207 at 57.)

On January 29, 2013, after an eight-day trial, a jury found Whoolery guilty of wire fraud conspiracy. (ECF No. 152.) On October 7, 2013, Whoolery was sentenced to a term of imprisonment of 120 months, to be followed by 3 years of supervised release. (ECF No. 282.) Whoolery was ordered to pay more than $1.7 million in restitution to various financial institutions including, for example, Bank of America, Deutsche Bank, and GE Money Bank, as well as to numerous individual borrowers. (Id.)

On October 21, 2013, Whoolery filed a timely notice of appeal to the Court of Appeals for the Third Circuit. (ECF No. 289.) Whoolery appealed on the ground that the government advanced an alternative theory of prosecution at trial that amounted to either a constructive amendment or a prejudicial variance of the indictment in violation of the Fifth Amendment. (ECF No. 332-1); Whoolery I, 579 F. App'x at 78-80. The appellate court rejected Whoolery's arguments and affirmed his conviction. Id.

Several months after the appellate court issued its mandate, Whoolery filed in this court a "Rule 33 motion based on newly discovered evidence," with a request for immediate release from custody. (ECF No. 334.) The court denied that motion, and the court of appeals affirmed that ruling. (ECF Nos. 338, 366-1); United States v. Whoolery, 625 F. App'x 24 (3d Cir. 2015) (Whoolery II). The court of appeals denied Whoolery's request that his case be assigned to a different district judge upon remand due to purported bias, noting that such a claim was "unsupported by the record and meritless." Whoolery II, 625 F. App'x at 27 & n.4.

On September 8, 2015, Whoolery timely filed a pro se § 2255 motion seeking relief based upon ineffective assistance of counsel and prosecutorial misconduct. (ECF No. 352.) Eight days later, and obviously before the government could respond to his § 2255 motion, Whoolery filed a motion for summary judgment, essentially seeking an expedited ruling on the first two grounds for relief raised in his § 2255 motion. (ECF Nos. 357-59.) In October and November 2015, the government responded to these pending motions, and Whoolery filed replies. (ECF Nos. 363-65, 368. 371-73.) During this time period, Whoolery also filed an emergency motion to appoint counsel and a motion for default judgment, to which the government responded. (ECF Nos. 367, 370, 374, 375.)

On December 2, 2015, this court denied the pending motions, with the exception of the § 2255 motion. (ECF Nos. 378-79.)  With respect to the § 2255 motion, the court set a supplemental briefing schedule because Whoolery's brief in support of that motion had not been docketed by the clerk of court when it was sent to the court around September 8, 2015. (ECF Nos. 376, 377.)  As a result, the more than 450-page brief was not accessible on the court's electronic case management system.  Shortly before the court issued these orders on December 2, 2015, Whoolery mailed to the court a motion for immediate release from custody, a motion for expedited review, and a second motion for summary judgment. (ECF Nos. 380-84.)  These motions were denied in an opinion and order dated December 8, 2015. (ECF Nos. 385-86.)  Again, shortly before the court issued this order, Whoolery mailed to the court a request for entry of default, which this court denied by order dated December 11, 2015. (ECF Nos. 387-89.)

Whoolery next filed two motions for reconsideration; one objecting to the supplemental briefing schedule, ECF Nos. 377, 391, and one objecting to the order denying his motions for summary judgment, default judgment, and appointment of counsel, ECF Nos. 378-79, 390.  Whoolery shortly thereafter filed a motion to amend or supplement his pending § 2255 motion. (ECF No. 397.)  The court ordered briefing on the motion to amend. (ECF Nos. 395, 398.)  Whoolery filed another motion to appoint counsel. (ECF No. 399.)  The government opposed Whoolery's motions for reconsideration and to appoint counsel, but did not oppose his motion to amend. (ECF No. 400.)  Because, however, the government already filed its supplemental response to

the § 2255 motion, ECF No. 394, the court allowed an additional period of time for the government to file a substantive response to the new matters raised in Whoolery's amendment, ECF Nos. 401. The government filed its response to the amended § 2255 motion, and Whoolery filed replies in connection with his motion to vacate and his motions for reconsideration. (ECF Nos. 402-03, 405-06.)

Less than two months after the briefing on Whoolery's motion to vacate was complete, and approximately three months after Whoolery sought permission from this court to amend his §2255 motion to add an additional claim for relief, Whoolery made another procedural maneuver in an attempt to obtain expedited review of his motion - this time mailing a petition for writ of mandamus to this court. This court forwarded the petition to the Court of Appeals for the Third Circuit, and the appellate court docketed the matter at No. 16-2502 on May 19, 2016.

In this opinion, the court rules upon Whoolery's § 2255 motion, ECF No. 352, the related requests for an evidentiary hearing and appointment of counsel, ECF Nos. 353, 404, and the two motions for reconsideration, ECF Nos. 390, 391. For the reasons that follow, all motions, and requests for relief, will be denied.

## III.  **Standard of Review**

Under 28 U.S.C. § 2255, a federal prisoner in custody may move the court which imposed the sentence to vacate, set aside, or correct the sentence upon the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255.  The Supreme Court reads § 2255 as stating four grounds upon which relief can be granted:

> (1) "that the sentence was imposed in violation of the Constitution or laws of the United States;" (2) "that the court was without jurisdiction to impose such sentence;" (3) "that the sentence was in excess of the maximum authorized by law;" and (4) that the sentence "is otherwise subject to collateral attack."

CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 625 (4th ed. 2011) (quoting Hill v. United States, 368 U.S. 424, 426-27 (1962)).  The statute provides as a remedy for a sentence imposed in violation of law that "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255.

"As a collateral challenge, a motion pursuant to [§ 2255] is reviewed much less favorably than a direct appeal of the sentence." United States v. Travillion, 759 F.3d 281, 288 (3d Cir. 2014) (citing United States v. Frady, 456 U.S. 152, 167–68 (1982)). "Indeed, relief under § 2255 is available only when 'the claimed error of law was a fundamental defect [that] inherently results in a complete miscarriage of justice, and...

present[s] exceptional circumstances where the need for the remedy afforded by the writ...is apparent.'" Id. (quoting Davis v. United States, 417 U.S. 333, 346 (1974) (internal quotation marks omitted)). The court construes petitioner's pro se § 2255 motion liberally, but petitioner "must abide by the same rules that apply to all other litigants." Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244-45 (3d Cir. 2013).

A district court is required to hold an evidentiary hearing on a motion to vacate sentence filed pursuant to § 2255, only if "the files and records of the case are inconclusive as to whether the movant is entitled to relief." United States v. Booth, 432 F.3d 542, 545-46 (3d Cir. 2005). "[T]he court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record." Id. at 545; see R. Governing § 2255 Cases R. 4(b).

## IV. Discussion

### A. The Motion to Vacate

Whoolery alleges that his sentence was imposed in violation of the United States Constitution and is otherwise subject to collateral attack for dozens of reasons. The briefing and evidence submitted by Whoolery in support of his § 2255 motion exceeds 1,500 pages. (ECF Nos. 352-54, 361, 372-73, 376, 396-97, 403-04, 406.) Whoolery asserts thirteen specific grounds for relief, which he labels "Counts." (ECF Nos. 376, 397.) Several of these counts catalogue numerous errors or instances of misconduct, without which (either individually or collectively), according to Whoolery, he would have been acquitted. Whoolery's claims can be grouped into two categories: (1)

9

ineffective assistance of counsel claims; and (2) prosecutorial misconduct claims. The court will address each of Whoolery's grounds for relief below, grouping Whoolery's specific challenges where possible to facilitate the court's review and the reader's understanding. The motion, the files and the records of the case, however, conclusively show that Whoolery is entitled to no relief. Whoolery's factual allegations are clearly frivolous based upon the existing record.

## 1. **Ineffective Assistance of Counsel**

To support a claim that counsel's assistance was so defective as to amount to a deprivation of one's Sixth Amendment right to effective assistance of counsel and require reversal of a conviction, Whoolery must show two things: (1) counsel's performance was deficient; and (2) counsel's deficient performance caused him prejudice. Williams v. Taylor, 529 U.S. 362, 390-91 (2000) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)); see Ross v. Dist. Att'y of the Cnty. of Allegheny, 672 F.3d 198, 210 (3d Cir. 2012).

"To show deficient performance, 'a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness. . . The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" Ross, 672 F.3d at 210 (quoting Harrington v. Richter, 562 U.S. 86, 104 (2011)). When evaluating whether counsel's performance was deficient, the relevant inquiry is whether

counsel's assistance was reasonable under the totality of the circumstances. Strickland, 466 U.S. at 688.

"The Supreme Court directs that our 'scrutiny of counsel's performance must be highly deferential' to avoid holding counsel incompetent because of reasonable strategic or tactical judgments which, with the benefit of tactical hindsight, might prove not to have best served his client's interests." United States v. Loughery, 908 F.2d 1014, 1018 (D.C. Cir. 1990) (quoting Strickland, 466 U.S. at 689). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected . . . if they are based on professional judgment." Id. at 681. "Strickland and its progeny make clear that counsel's strategic choices will not be second-guessed by post-hoc determinations that a different . . . strategy would have fared better." Roland v. Vaughn, 445 F.3d 671, 681-82 (3d Cir. 2006).

In the context of criminal defense, "certain litigation decisions are considered 'fundamental' and are for the client to make. These include decisions on whether to plead guilty, whether to testify, and whether to take an appeal. After consultation with the client, all other decisions fall within the professional responsibility of counsel." Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996) (citing Jones v. Barnes, 463 U.S. 745, 751 (1983)).

"With respect to prejudice, a challenger must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Harrington, 562 U.S. at 104. It is not enough to show that counsel's errors had "some conceivable effect on the outcome of the proceeding." Id. (citing Strickland, 466 U.S. at 693). Counsel's errors must be so serious as to deprive a defendant of a fair trial; a trial whose result is reliable. Id. (citing Strickland, 466 U.S. at 687). In other words, a petitioner must show that there is a reasonable probability that his counsel's errors caused his conviction. Where the evidence is overwhelmingly in support of the jury's verdict, notwithstanding alleged deficiencies of counsel, it is difficult to conclude that there is a showing of prejudice. Strickland, 466 U.S. at 695-96; Williams, 529 U.S. at 391; United States v. Baird, 312 F. App'x 449, 452 (3d Cir. 2008); United States v. Jenkins, 333 F.3d 151, 155 (3d Cir. 2003); Buehl v. Vaughn, 166 F.3d 163, 181-82 (3d Cir. 1999); accord Allen v. Chandler, 555 F.3d 596, 598 (7th Cir. 2009) ("even if counsel's performance was deficient, [petitioner] was not prejudiced . . . because the evidence of guilt was overwhelming").

As both of these components must be demonstrated to support a claim of ineffective assistance, the absence of one negates the need to address the other. Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). A court, therefore, need not determine whether counsel's

performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. Marshall v. Hendricks, 307 F.3d 36, 87 (3d Cir. 2002) (citing Strickland, 466 U.S. at 697)); see McAleese v. Mazurkiewicz, 1 F.3d 159, 170 (3d Cir. 1993), cert. denied, 510 U.S. 1028 (1993) ("Indeed, this Court has read Strickland as requiring the courts to decide first whether the assumed deficient conduct of counsel prejudiced the defendant.") (internal quotations and citations omitted). By the same token, where a defendant fails to prove the unreasonableness prong of Strickland, a court need not reach the prejudice prong. Werts v. Vaughn, 228 F.3d 178, 224 n.24 (3d Cir. 2000).

Whoolery argues that his trial counsel, Douglas Sughrue ("Counsel"), was ineffective because he did, or failed to do, many things during pretrial and trial proceedings. (ECF Nos. 352, 376.) Whoolery asserts nine grounds for relief, or "counts," in connection with his ineffective assistance of counsel claim, several of which include numerous subparts. (ECF Nos. 352, 376, 397.) The grounds for relief can be grouped into four categories:

> (1) Errors Relating to Failure to Present or Challenge Legal Issues;
>
> (2) Errors Relating to the Jury Instructions;
>
> (3) Errors Relating to the Evidence Gathered and Presented; and
>
> (4) Cumulative Effect of these Errors.

As will be explained in detail below, Whoolery is not entitled to relief on any of these grounds. Counsel's representation did not fall below an objective standard of

reasonableness with respect to any of the errors alleged by Whoolery. Even if Counsel's performance fell below that standard and was constitutionally deficient, Whoolery could not establish a reasonable probability that, without the alleged errors (either alone or cumulatively), he would have been acquitted. This court previously found, and the Court of Appeals for the Third Circuit acknowledged, that the evidence of Whoolery's guilt at trial was overwhelming. Whoolery II, 625 F.App'x at 26; (ECF No. 338.) Where the evidence is overwhelmingly in support of the jury's verdict, notwithstanding alleged deficiencies of counsel, it is difficult to conclude that there is a showing of prejudice. Strickland, 466 U.S. at 695-96; Williams, 529 U.S. at 391; Baird, 312 F. App'x at 452; Jenkins, 333 F.3d at 155; Buehl, 166 F.3d at 181-82. The purported errors made by Counsel, if they occurred, do not change the fact that the testimonial and documentary evidence establishing Whoolery's guilt at trial was consistent, corroborated, and overwhelming.

### a. Errors Relating to Failure to Present or Challenge Legal Issues

Whoolery contends that he was denied his constitutional right to effective assistance of counsel because Counsel:

> (1) did not file a motion to dismiss the original indictment on statute of limitations grounds;
>
> (2) did not assert a due process/Brady violation when the government produced "incomplete loan files;"
>
> (3) effectively conceded that the government proved the materiality element of the charged wire fraud conspiracy beyond a reasonable doubt; and

14

(4) stipulated to the interstate commerce element of the charged
wire fraud conspiracy.

(ECF No. 376-1 at 13-20; ECF No. 376-4 at 92-100; ECF No. 376-5 at 1-7, 21-28; ECF

No. 396 at 5-7, 57-58.)

As summarized above, Whoolery must show that Counsel's representation with

respect to these issues fell below an objective standard of reasonableness, based upon the

totality of the circumstances and after affording Counsel's strategic decisions appropriate

deference. Strickland, 466 U.S. at 688-89; Ross, 672 F.3d at 210; Roland, 445 F.3d at

681-82.  Even if Whoolery can establish that Counsel's performance was deficient, he

must additionally demonstrate a reasonable probability that, but for Counsel's errors he

would have been acquitted. Glover, 531 U.S. at 203.  Where the evidence is

overwhelmingly in support of the jury's verdict, notwithstanding alleged deficiencies of

counsel, it is difficult to conclude that there is a showing of prejudice. Strickland, 466

U.S. at 695-96.

Because Counsel did not act objectively unreasonably with respect to his

presentation of the legal issues identified above, Whoolery cannot establish the first

prong of his ineffective assistance of counsel claim.  Even if Counsel's representation

was constitutionally deficient, Whoolery cannot establish that he would have been

acquitted were it not for Counsel's errors.  For the reasons set forth below, Whoolery

would not have prevailed on any of the legal issues identified even if Counsel raised them

during pretrial or trial proceedings.  Moreover, the evidence of Whoolery's guilt was

overwhelming.  The court, nevertheless, considers each of Whoolery's alleged errors in turn below.

### (i) <u>Statute of Limitations</u>

According to Whoolery, because the original indictment did not identify Jason Sheraw ("Sheraw") by name, the conspiracy charged in the first indictment ended on May 27, 2005, the date on which the Federal Bureau of Investigation ("FBI") searched Kenneth Cowden's ("Cowden") residence. (ECF No. 396 at 7.)  Because the original indictment was not returned until July 27, 2010, Whoolery argues it fell outside the 5-year statute of limitations, and should have been dismissed, making it impossible for the government to have validly obtained the superseding indictment in October 2011. (<u>Id.</u> at 5-7.)

In response, the government argues that the original and superseding indictment allege that Whoolery participated in a wire fraud conspiracy that did not end until November 2006, and because both indictments were returned prior to November 2011, any motion to dismiss on statute of limitations grounds would have been frivolous and futile. (ECF No. 363 at 5-6; ECF No. 394 at 11-12.)  The government further points out that the evidence at trial established that the charged conspiracy continued until at least November 2006, further confirming that no statute of limitations defense was available to Whoolery. (ECF No. 363 at 6 n.1.)

Both Whoolery and the government contend that a 5-year statute of limitations applies to the wire fraud conspiracy charged in this matter. 18 U.S.C. § 3282; (ECF No. 394 at 11-12; ECF No. 396 at 6-7.)  Neither party cites to, nor considers the effect on this case of, 18 U.S.C. § 3293, which extends the statute of limitations for conspiracy to commit wire fraud to ten years "if the offense affects a financial institution." 18 U.S.C. § 3293.  The indictment alleged that Whoolery submitted "loan applications to lenders" that included various misrepresentations and falsified documents. (ECF No. 1 ¶¶ 4-5.)  The government presented evidence at trial that lender banks suffered actual financial losses as well as realistic prospects of loss due to the submission of these fraudulent loan applications. (ECF No. 155 (testimony of Palmertree, Secoda, Flores, and Rowland)); United States v. Pelullo, 964 F.2d 193 (3d Cir. 1992); United States v. Agne, 214 F.3d 47 (1st Cir. 2000).   The court ordered Whoolery to pay restitution to various banks at sentencing. (ECF No. 282.)  Banks are financial institutions within the meaning of § 3293. 12 U.S.C. §§ 1813, 4742.

There can be no plausible dispute that the original indictment was timely filed if the 10-year statute of limitations of § 3293 applies, even if Whoolery is correct that the statute of limitations began to run on May 27, 2005, when the FBI searched Cowden's house and Cowden began to cooperate with the government.  Under these circumstances, Counsel's failure to file a motion to dismiss the indictment on statute of limitations grounds cannot be deemed objectively unreasonable.  Counsel cannot be ineffective for

failing to raise a meritless claim. <u>United States v. Sanders</u>, 165 F.3d 248, 253 (3d Cir. 1999).

If, however, the 5-year statute of limitations set forth in § 3282 applies, a motion to dismiss the indictment would have remained meritless and futile. The original indictment was returned on July 27, 2010. (ECF No. 1.) The charged conspiracy, therefore, must have existed through at least July 27, 2005 in order for the original indictment to have been timely filed. Both the allegations of the indictment, and the evidence at trial, establish that the Whoolery-First Capital conspiracy existed after July 27, 2005, making the original indictment timely filed. (ECF No. 1; ECF No. 363-1 at 30; ECF No. 209 at 166-68, 184-85; Trial Ex. GF-125 (January 2006); Trial Ex. WF-1 (December 2006).)

Despite this incontestable fact, Whoolery argues that, because Sheraw was not named in the original indictment, "there is no conspiracy that continues after Gray and Cowden's involvement terminates, and there are no material misrepresentations after 2003." (ECF No. 396 at 7.) To consider this argument, one must understand who these individuals are and what role they played in the Whoolery-First Capital conspiracy. Cowden prepared appraisals with inflated values for Whoolery and First Capital between 2003 and May 2005. (ECF No. 209 at 170-80.) Cowden and Baldwin performed similar services for the conspiracy. (ECF No. 209 at 153-65; ECF No. 363-1 at 5.) Cowden's services to the Whoolery-First Capital conspiracy ended in May 2005, when the FBI searched his house and he began cooperating with the government. (ECF No. 207 at 179-

80.)  Baldwin provided fraudulent appraisal services to the Whoolery-First Capital conspiracy from 2003 until the end of 2006.  Gray and Sheraw were licensed real estate appraisers who Whoolery paid to allow Baldwin to use their license numbers and signatures to create appraisals with inflated values.  Baldwin initially used Gray's license when she joined the conspiracy in 2003, but was forced to stop using her credentials when Gray left the conspiracy in December 2004.  After that time, Baldwin used Sheraw's licensure information to create fraudulent appraisals. (ECF No. 209 at 161-64; ECF No. 211 at 36-39.)   Cowden used the licensing credentials of appraisers other than Gray and Sheraw to create his fraudulent appraisals for the Whoolery-First Capital conspiracy, until Cowden left the conspiracy in May 2005.

As an initial matter, Whoolery's contention that no misrepresentations were made after 2003 is contradicted by the record and Whoolery's own recitation of the facts.  Whoolery acknowledges that Gray was involved in the conspiracy through the end of 2004 and Cowden was involved in the conspiracy until May 2005. (ECF No. 376 at 16; ECF No. 396 at 7.)  Whoolery proffers no evidence to the contrary in connection with his § 2255 motion.  Whoolery's assertion that no misrepresentations were made after 2003 is frivolous, and contradicted by the undisputed record.

There is likewise no factual basis upon which to find that the Whoolery-First Capital conspiracy ended in May 2005, when Cowden left the conspiracy, because Sheraw was not named in the original indictment. Whoolery argues, albeit implicitly, that any fraud committed by Baldwin after December 2004 cannot support the conspiracy charged in the original indictment because that document does not explain that Baldwin used Sheraw's licensure information, instead of Gray's, after that date. This argument lacks merit. The testimonial and documentary evidence at trial established that Baldwin's services to the charged wire fraud conspiracy continued after Gray left the conspiracy. (ECF No. 207 at 31-32; ECF No. 208 at 71-73; ECF No. 209 at 166-68, 184-85; ECF No. 210 at 165-66, 176; Trial Ex. GF-125 (January 2006); Trial Ex. WF-1 (December 2006)).

The fact that Sheraw was not named in the original indictment is inconsequential. Notably, neither the original or the superseding indictment lists the names of every licensed appraiser whose credentials Cowden used during the conspiracy. (ECF Nos. 1, 46; ECF No. 207 at 183-88 (identifying Robert Katterson, Burton Trautman, and Coby Jones as some of the names under which Cowden submitted fraudulent appraisals).) Baldwin and Cowden, however, were both identified in the original and superseding indictments as the individuals who, on behalf of the conspiracy, prepared fraudulent appraisals. (ECF Nos. 1, 46.) Whoolery's agreement with these two individuals to prepare fraudulent appraisals for First Capital constituted the crime of conspiracy to commit wire fraud. 18 U.S.C. §§ 1343, 1349; Iannelli v. United States, 420 U.S. 770, 777 n.10 (1975) (the agreement is the evil at which the crime of conspiracy is directed.); United States v. Kelly, 892 F.2d 255, 258 (3d Cir.

20

1989) (same). Whoolery's agreements with Baldwin and Cowden existed irrespective of whose name Baldwin or Cowden used to sign a particular appraisal. Whoolery's agreements with Baldwin and Cowden also existed independently of whether Whoolery had separate agreements with the licensed appraiser whose credentials were being used. The record reflects that while Whoolery had agreements with some of the licensed appraisers, such as Gray, he did not have agreements with others, such as Robert Katterson. (ECF No. 207 at 54-56, 187; ECF No. 208 at 70-71; ECF No. 209 at 153-54.)

The indictment charges, and the record reflects, that Baldwin submitted fraudulent appraisals after May 2005, and through 2006, on behalf of First Capital. Baldwin's criminal enterprise with Whoolery continued beyond December 2004, even though Baldwin stopped using Gray's licensing credentials and began using Sheraw's at that point. The fact that the original indictment did not list Sheraw as one of the licensed appraisers whose credentials were used to submit fraudulent appraisals does not establish that Whoolery's criminal agreement with Baldwin ended in December 2004, when Gray left the conspiracy, and that the Whoolery-First Capital conspiracy ended entirely in May 2005, when Cowden left the conspiracy. The original indictment alleges, and the evidence at trial establishes, that Whoolery's criminal enterprise with Baldwin regarding the creation of fraudulent appraisals continued after Gray and Cowden left the conspiracy. The submissions made by Whoolery in connection with his § 2255 motion do not contradict this crucial fact.

In any event, the wire fraud conspiracy charged in the original indictment was not limited to Baldwin's or Cowden's submission of fraudulent appraisals. The Whoolery-First Capital conspiracy also operated by using various devices, such as altering photographs and fabricating or altering income and asset statements. (ECF No. 1 ¶¶ 6-7); Whoolery I, 579 F. App'x at 80. Such conduct involved individuals other than Baldwin and Cowden and occurred regardless whether they were using Gray's license, Sheraw's license, a completely fabricated license, a stolen license, or their own license. Sheraw had nothing to do with these kinds of fraud, further demonstrating that the absence of his name from the original indictment is inconsequential.

The failure of the original indictment to name Sheraw does not affect when the statute of limitations began to run. Even if it did, the charged wire fraud conspiracy included misdeeds beyond the misuse of licensed appraisers' credentials, which is the only misconduct with which Sheraw was involved. Under these circumstances, Counsel's failure to file a motion to dismiss the indictment on statute of limitations grounds cannot be deemed objectively unreasonable. A motion to dismiss would have been futile because there was no factual basis on which to argue that the conspiracy charged in the original indictment ended before July 27, 2005. The original indictment charged, and the evidence at trial established, that the Whoolery-First Capital conspiracy continued through 2005 and 2006. Whoolery proffers no evidence to the contrary, and his argument that the absence of Sheraw's name from the indictment causes the charged conspiracy to end by May 2005 is

illogical and meritless.  Counsel cannot have acted objectively unreasonably by failing to file a motion raising a meritless claim. <u>Sanders</u>, 165 F.3d at 253.

It follows that Whoolery cannot establish the requisite reasonable probability that the result of these proceedings would have been different if Counsel had filed a motion to dismiss the indictment on statute of limitations grounds.  For all the reasons set forth above, such a motion would have been futile.  Whoolery's ineffective assistance of counsel claim on this ground fails on both the first and second prongs.

### (ii) <u>Incomplete Loan Files</u>

The government's failure to produce "compete loan files" and Counsel's failure to obtain "complete loan files" is a theme that repeats throughout Whoolery's § 2255 motion in various forms and as the basis of numerous claims for relief.  According to Whoolery, if documents used during the funding and closing of a real estate loan had been produced at trial, the jury would have acquitted him of the charged wire fraud conspiracy.  Whoolery argues that the "missing loan documents," which include, but are not limited to, truth in lending statements, good faith estimates, mortgage broker business contracts, closing instructions, loan program forms, and underwriting findings would have established several things.  Those things, he asserts, include that: a) lenders, not First Capital, were ultimately responsible for deciding to fund a loan; b) lenders relied on underwriting findings and the underwriting process, not the loan applications submitted by First Capital, to decide whether to fund a loan; c) lenders, not First Capital, were responsible for ensuring that First Capital's fees complied with state and federal laws;

and d) borrowers were notified of, acknowledged, and accepted all fees charged by First

Capital before closing a loan. [2]  In short, Whoolery argues that the documents would have

established that lenders and borrowers are to be blamed for funding mortgage loans that

were too risky for the lenders or too expensive for the borrowers, not Whoolery, thereby

establishing his innocence.

This is one part of what Whoolery characterizes as the "good faith defense"[3] that

Counsel should have presented, but allegedly did not present, to the jury, thereby causing

---

[2] Contrary to Whoolery's contentions, a document that he calls the "U.S. Attorney Bulletin" would not have proven the relevancy of the allegedly missing loan documents. (ECF No. 354-4.) That bulletin is akin to a newsletter or law review in which individuals submit material for publication.  It states on its face that the contributors' views are not endorsed by the Executive Office for United States Attorneys.  The specific article that Whoolery cites, written by an Assistant United States Attorney in the Northern District of Georgia, discusses the kinds of evidence needed to prove mortgage fraud in circumstances in which buyers and sellers collude to extract cash from a real estate transaction, either to provide the down payment, or for profit.  The article does not discuss wire fraud conspiracy charges, or speak to schemes perpetrated by mortgage brokerage firms.  Aside from being inadmissible hearsay, the article is irrelevant to the wire fraud conspiracy charged in this case.  This piece of evidence does not establish that Counsel had a duty to obtain, or to object to not having, the missing loan documents in this case.

[3] The other part of Whoolery's good faith defense is his contention that, to the extent First Capital employees were engaged in fraud, he was unaware of their misconduct.  Whoolery claims that Counsel failed to support this defense by presenting evidence that Whoolery was often out of the office, his mother, Judy Immekus, ran the office, and he terminated employees who engaged in fraud.  The court will address this aspect of Whoolery's § 2255 motion in section IV.A.1.c.iv. of this opinion.

Whoolery's purportedly wrongful conviction.[4] (ECF No. 376-2 at 165.) Although not stated in these terms, this part of Whoolery's good faith defense is based upon principles of actual reliance, causation, and contributory negligence. These, however, are not principles that would have absolved Whoolery of criminal liability under the circumstances of this case.

Whoolery was charged with conspiracy to commit wire fraud. (ECF Nos. 1, 46.) In the final instructions to the jury, the court explained that a wire fraud conspiracy occurs when a person agrees to participate in a scheme to defraud or to obtain money or property by making false representations about a material fact. (ECF No. 213 at 96, 98.) The government was not required to prove that the planned wire fraud ever took place in order to establish that a criminal conspiracy existed. (Id.) The government nevertheless submitted ample evidence establishing that the planned wire fraud did take place. This evidence consisted of, among other things, the testimony of lender representatives who explained that the appraisal and income/asset information falsified by First Capital was important to lenders when deciding whether to fund a loan. (ECF No. 207 at 123-31; ECF No. 209 at 91-97; ECF No. 211 at 54-62; ECF No. 212 at 17-24.) Borrowers also testified about the circumstances surrounding First Capital's fees and their size. (Id.)

---

[4] Whoolery's contention that Counsel was unconstitutionally ineffective because he never uttered the phrase "good faith defense" in front of the jury is untenable. Counsel presented evidence to the jury to establish that Whoolery was not guilty of the charged conspiracy for many reasons including that lenders did not rely upon First Capital's loan applications, borrowers were aware of the fees being charged by First Capital, and Whoolery was not aware of, and did not tolerate, fraud at First Capital. (ECF No. 207 at 163, 168-69; ECF No. 209 at 99-100, 103-05; ECF No. 211 at 66-72; ECF No. 213 at 123-26, 128-29, 139, 141, 146-47.)

Whoolery fails to explain how the allegedly missing loan documents would contradict this testimony. Whoolery identifies no borrower or lender witness who would have offered contrary testimony if the missing loan documents were available.

In any event, even if the missing loan documents and the related, but unidentified, testimony would have established that lenders did not actually rely upon the information falsified by First Capital when deciding whether to fund a loan, and made careless or negligent funding decisions, or that borrowers were not misled about First Capital's fees, these facts would not have mandated Whoolery's acquittal. Proof of a successful deception is not required in a wire fraud, or wire fraud conspiracy, prosecution. United States v. Moleski, No. 14-4681, 2016 WL 231537, at *2 (3d Cir. Jan. 20, 2016) (citing Neder v. United States, 527 U.S. 1, 25 (1999)). Nor is it a defense in a wire fraud prosecution "that the intended victim was too smart to be taken in" or was negligent in failing to discover the fraudulent scheme. Id. (citing United States v. Coffman, 94 F.3d 330, 333 (7th Cir. 1996), and United States v. Coyle, 63 F.3d 1239, 1244 (3d Cir. 1995)).

Turning to the significance of First Capital's fees to this prosecution, the government offered evidence about the circumstances surrounding, and the size of, First Capital's fees to establish a motive for Whoolery's participation in the scheme, and to reflect Whoolery's intent to deceive. The government never alleged that the fees violated any state or federal law, including the Truth in Lending Act. The government never identified the kind, amount, or circumstances of First Capital's fees as a manner, means, or object of the conspiracy. The government was not required to prove that First

Capital's fees were excessive, in violation of the law, or charged without prior notice to the borrowers, or that borrowers were defrauded by First Capital, in order to secure Whoolery's conviction for participating in the charged wire fraud conspiracy. The Whoolery-First Capital conspiracy's practices of inflating the fair market value of a property and falsifying income and asset documentation were unaffected by whether a borrower did or did not know or understand the fees being charged by First Capital. Under these circumstances, Whoolery's purported proof, through the missing loan documents, that First Capital's fees were legal and that borrowers understood and accepted them would not have been relevant to a jury's determination about whether Whoolery agreed to participate in a scheme to defraud lenders. (ECF No. 213 at 96, 98.)

In answering this question, as reflected in this court's final jury instructions, to which Whoolery does not object, the jury was asked to assess whether the information falsified pursuant to the Whoolery-First Capital conspiracy about the value of properties offered as collateral for loans and the financial condition of borrowers "would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the representation or statement in making a decision whether to approve loans for distribution to particular homeowners." (ECF No. 213 at 98); Neder, 527 U.S. at 16 (a false statement is material if it has a natural tendency to influence, or is capable of influencing, a decision). Materiality is based upon an objective standard, not upon whether information was actually "material for a specific transaction," as Whoolery contends. (ECF No. 396 at 68.) The pertinent question at trial, therefore, was whether Whoolery agreed to falsify

information that it was objectively reasonable for a lender to rely upon in deciding whether to fund a loan. The allegedly missing loan documents, and evidence related thereto, would not have been probative about what a reasonable person would or would not have relied upon in deciding whether to fund loans. None of the documents that Whoolery contends were withheld from him would have established that a reasonable lender would not consider the value of collateral or the financial status of a borrower to be important facts when deciding whether to extend a loan. Because the allegedly missing loan documents would not have exonerated Whoolery under the facts of this case or the applicable law, Counsel's failure to obtain the evidence, or to object to the government's alleged failure to disclose the evidence, cannot form the basis of an ineffective assistance of counsel claim, or, as will be discussed later in this opinion, a prosecutorial misconduct claim.

With this background, the court examines Whoolery's contention that Counsel was unconstitutionally ineffective because he did not file a motion claiming that the government violated Whoolery's due process/<u>Brady</u> rights by failing to disclose complete loan files prior to trial. (ECF No. 376-4 at 96-100; ECF No. 376-5 at 1-8; ECF No. 397 at 57-58.)[5] Whoolery appears to argue that the <u>Brady</u> motion should have been based upon

[5] Whoolery also contends that Counsel was unconstitutionally ineffective because he failed to subpoena the complete loan files directly from the lenders and to present testimonial evidence to explain the parts of a complete loan file and how a loan is underwritten, funded, and closed, and what fees First Capital was permitted to charge. The court will address these arguments in section IV.A.1.c.ii. of this opinion. The present alleged error relates only to Counsel's failure to file a pretrial motion claiming that the government violated Whoolery's constitutional rights by failing to produce complete loan files during discovery.

either the government's failure to subpoena complete loan files during its investigation of this case, or failure to produce the complete loan files that it obtained during pretrial proceedings. As set forth above, Whoolery contends that the complete files would have revealed that lenders did not actually rely upon the fraudulent information provided by First Capital about the fair market value of the property that would act as collateral for a loan, or about the financial condition of the borrowers when deciding whether to fund a loan, and that borrowers were aware of and agreed to pay the fees charged by First Capital, which were approved by the lenders.

A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused, including both impeachment evidence and exculpatory evidence. <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). In order to prevail on a <u>Brady</u> claim, a petitioner must establish that: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or it had impeachment value; (2) the prosecution suppressed the evidence, "either willfully or inadvertently;" and (3) the evidence was material. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999); <u>Lambert v. Blackwell</u>, 387 F.3d 210, 252 (3d Cir. 2004). A petitioner demonstrates materiality of the suppressed evidence by showing a "reasonable probability of a different result." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995). In turn, "a reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." <u>Id.</u> Any motion that Counsel could have filed alleging a <u>Brady</u> violation based upon the government's alleged failure to

obtain or produce complete loan files would have been meritless, and therefore, cannot support an ineffective assistance of counsel claim. <u>Sanders</u>, 165 F.3d at 253.

To the extent that Whoolery contends that Counsel should have filed a motion based upon the government's alleged failure to request complete loan files when it subpoenaed documents during its investigation of this case, Whoolery makes no showing that such a motion would have prevailed. Whoolery identifies no authority that requires the government under <u>Brady</u> or its progeny, or any other legal doctrine, to investigate a case or subpoena documents in the way preferred by defendant.[6] Although the court can conceive of a situation in which the government violates a defendant's constitutional rights by explicitly instructing a third party *not* to disclose exculpatory documents in response to subpoenas, or crafting subpoenas in such a way as to purposefully avoid receipt of exculpatory materials, Whoolery does not allege that the government engaged in such conduct here, and proffers no evidence with his § 2255 to indicate that it did.

In this case, the government explained at the pretrial conference that under its theory of the case only certain documents related to a loan transaction were considered relevant and necessary to prove that Whoolery engaged in the wire fraud conspiracy with which he was charged. (ECF No. 205 at 17-30.) Whoolery offers no factual or legal basis on which to find that the government's stated investigatory techniques violated his constitutional rights. Any pretrial motion filed based upon this theory would have been

---

[6] The court's statement that Counsel could subpoena any documents he believed were missing and helpful to Whoolery's defense does not establish that Whoolery's constitutional rights were violated by the government's decision not to subpoena those documents.

speculative, meritless, and futile and Counsel cannot have violated Whoolery's constitutional rights by failing to file it. <u>Sanders</u>, 165 F.3d at 253.

To the extent that Whoolery contends that Counsel should have filed a motion based upon the government's alleged failure to disclose complete loan files that were actually in the government's possession, the motion likewise would have failed. At the pretrial hearing there was no indication that the government refused to give Counsel access to any and all loan documents in its possession, or otherwise withheld loan documents that were in its possession. Nothing about the exhibits used by the government during trial proves otherwise, despite Whoolery's claims to the contrary. Whoolery's complaint during pretrial proceedings, instead, was that the loan files that the government had were incomplete, and did not include items that Counsel represented to the court at the time would be helpful to Whoolery's defense. (ECF No. 205 at 15-30.) As the court repeatedly informed Counsel at that hearing, however, if the government did not have particular documents, the court could not order the government to produce them or sanction the government for failing to produce them. (<u>Id.</u>) Whoolery's repeated contentions in his § 2255 motion that the government admitted or acknowledged that it withheld exculpatory documents are made entirely without support, and are, in fact, contradicted by the record. (ECF No. 396 at 13-19.) There was no basis for Counsel to file a motion accusing the government of failing to disclose loan files that were actually in its possession. Counsel cannot have violated Whoolery's constitutional rights by failing to file a meritless motion. <u>Sanders</u>, 165 F.3d at 253.

Even if Whoolery could establish that the government suppressed certain loan documents under either of the two theories identified above, Counsel's failure to file a motion claiming that Whoolery's constitutional rights were violated as a result would still not be objectively unreasonable. Accepting as true that the allegedly missing loan documents would have proven, as Whoolery contends, that lenders did not actually rely upon the misrepresentations in First Capital's loan applications in deciding to fund a loan, and that the borrowers were aware of the fees that First Capital was charging prior to closing the loan, Whoolery cannot establish a reasonable probability that he would have been acquitted if those facts were established at trial. Kyles, 514 U.S. at 434. As discussed above, these facts do not support defenses to wire fraud conspiracy that are recognized under the law. See supra pp. 25-28. If the documents were not materially exculpatory, even if the government failed to disclose them, Counsel could not have established a Brady violation, making Counsel's decision not to file a motion alleging a violation of Whoolery's due process rights objectively reasonable.

Although a Brady violation can also occur if the government fails to disclose material evidence with impeachment value, Whoolery does not identify how the missing loan documents could have provided meaningful impeachment evidence of any adverse witness at trial. Whoolery fails to establish that the allegedly missing loan documents could have been used to impeach the lender witnesses on any pertinent fact. Even if the documents could have been used to challenge the lender witnesses' testimony that representations made in First Capital's loan applications about property values and

borrowers' financial condition were important to their funding decisions, given that materiality is defined for purposes of the wire fraud statute by reference to a reasonable person standard, not an actual reliance standard, this method of impeachment would have been without ultimate consequence to the jury's verdict. In any event, Counsel did challenge the lender witnesses on cross-examination about the importance of First Capital's representations to their decision to fund a loan. (ECF No. 207 at 134-51; ECF No. 209 at 99-107; ECF No. 211 at 62-73; ECF No. 212 at 24-35.) Whoolery makes no showing that having the missing loan documents would have affected or advanced this line of questioning in any meaningful way. Whoolery, therefore, cannot establish a reasonable probability that he would have been acquitted if additional documents were available to Counsel during cross-examination of the lender representatives. Kyles, 514 U.S. at 434.

The missing loan documents likewise would not have provided any basis upon which to impeach the borrower witnesses on any pertinent fact. Even if the documents could have been used to demonstrate to the borrowers that First Capital's fees were disclosed, given that the size, disclosure, and fairness of First Capital's fees were not elements of the charged wire fraud conspiracy this method of impeachment would have been without ultimate consequence to the jury's verdict. See supra pp. 25-28; see infra Section IV.A.1.a.iii. In any event, documents were available to Counsel, and Counsel did use those documents to cross-examine the borrowers about their awareness of and agreement to pay First Capital's fees. (e.g., ECF No. 207 at 153-56; ECF No. 209 at 107-

33

09.) Whoolery makes no showing that having the missing loan documents would have affected or advanced this method of cross-examination in any meaningful way. Whoolery, therefore, cannot establish a reasonable probability that he would have been acquitted if additional documents were available to Counsel during cross-examination of the borrowers. <u>Kyles</u>, 514 U.S. at 434.

In summary, the allegedly missing loan documents were not substantively exculpatory under the law applicable to this case, and would not have provided any meaningful basis upon which to impeach the government's witnesses that was not already available to, and utilized by, Counsel at trial. For these reasons, even if the government withheld the documents, a fact in support of which Whoolery proffers no evidence,[7] that misconduct would not rise to the level of a <u>Brady</u> violation. Whoolery, therefore, cannot establish that Counsel acted objectively unreasonably by not filing a motion asserting a violation of his due process rights. For the same reasons, Whoolery also cannot demonstrate the requisite reasonable probability that he would have been acquitted if Counsel had filed a <u>Brady</u> motion raising these arguments. Whoolery cannot establish that he was prejudiced by Counsel's failure to file a <u>Brady</u> motion.

---

[7] Whoolery's claims that the prosecutor "admits" that material, exculpatory documents were withheld because Whoolery's arguments are summarized in the government's opposition brief, or because Mark Hipsley's "work files" or sample "complete loan files" were used at trial are not supported by the record. No admission by the prosecutor of a <u>Brady</u> violation is present on the trial record or in the § 2255 papers.

### (iii)  **Materiality Element**

Whoolery claims that Counsel was unconstitutionally ineffective because he failed to use the "available evidence" to challenge the government's proof of materiality. (ECF No. 376-5 at 21-28.)  Although purportedly distinguishing this argument from the one set forth immediately above, Whoolery again complains that Counsel erred by failing to obtain the missing loan documents so that the jury could understand what was and was not "material" to a particular transaction, which is the same argument that Whoolery made, and the court rejected, in connection with the previous challenge.  The court nevertheless addresses this argument separately in the interest of clarity and completeness.

As an initial matter, even if Counsel's performance was deficient because he did not challenge the government's proof of the materiality element of the charged wire fraud conspiracy, Whoolery cannot establish prejudice.  The arguments that Whoolery contends Counsel should have made and the evidence that Whoolery contends Counsel should have presented were not relevant under the pertinent substantive law.  Materiality under the wire fraud statute is not based upon actual deception, reliance, or causation, but upon an objective, reasonable lender standard. Neder, 527 U.S. at 16; Moleski, 2016 WL 231537, at *2.  Counsel's presentation of evidence to establish the former facts, therefore, could not have affected the jury's verdict.  Even if Counsel challenged the government's proof of materiality in the manner Whoolery sets forth in his § 2255 motion, Whoolery cannot demonstrate a reasonable probability that the jury's verdict would have changed.

Although Whoolery recognizes that materiality is based upon a reasonable person standard, he argues that Counsel was ineffective for failing to point out to the jury that the government failed to prove what a lender would have considered important when deciding to fund a loan in the 2003-2006 time-frame. (ECF No. 376-5 at 24-25.) Whoolery explains that a jury could only have determined what was "material to the lender for each specific transaction" if the jury was given the borrower's credit score, the underwriting findings, the requirements of the particular loan program being used, and information about whether a drive-by appraisal was acceptable, and other related evidence. Whoolery's arguments are aimed at proving what was actually material to a particular transaction. Wire fraud, however, is judged based upon a reasonable person standard. Neder, 527 U.S. at 16. Moreover, Whoolery was charged with, and found guilty of, conspiracy to commit wire fraud. Whoolery's crime was entering into an agreement to falsify information that a reasonable person would consider important when deciding whether to fund a loan. (ECF No. 213 at 96, 98.) It was not necessary for the government to prove that wire fraud actually occurred in order to obtain a conviction in this case. (Id.)

The government, instead, was required to establish that a reasonable person would have considered the fair market value of the collateral securing a loan and the borrower's financial circumstances to be important to a lender when deciding whether to fund a loan. Neder, 527 U.S. at 16. The government established this by calling several lender representatives who testified that such information was, in fact, important to them when

deciding whether to fund a loan at the time the Whoolery-First Capital conspiracy existed. (ECF No. 207 at 123-31; ECF No. 209 at 91-97; ECF No. 211 at 54-62; ECF No. 212 at 17-24.) This evidence adequately satisfied the materiality element of the charged wire fraud conspiracy. In the face of this evidence, proof by Counsel that the value of Property A or the financial condition of Borrower B was not actually important to Lender Z in deciding to fund Loan #2 would have been inconsequential under the applicable law. Neder, 527 U.S. at 16; Moleski, 2016 WL 231537, at *2.[8] The pertinent question was whether a reasonable lender would rely upon such information, not whether a particular lender actually relied upon such information. Id. Counsel cannot be deemed to have acted objectively unreasonably by failing to present evidence that would not have disproved the materiality element of the charged wire fraud conspiracy under applicable law.

This aspect of Whoolery's ineffective assistance of counsel claim, therefore, fails under both the first and second Strickland prongs.

---

[8] Such evidence would also have been in conflict with the primary defense presented by Counsel at trial; i.e., that to the extent fraud occurred at First Capital, it was directed by others, including Whoolery's deceased mother, Judy Immekus, and was unknown to Whoolery. (ECF No. 213 at 123-51.) Although Counsel could have presented a two-pronged defense; i.e., first, that First Capital's practices did not constitute wire fraud, and second, if they did, Whoolery did not participate in that fraud, strategic choices as to how to defend a case are "virtually unchallengeable." Strickland, 466 U.S. at 690. Counsel chose a strategy of defending primarily based upon Whoolery's alleged lack of knowledge of any fraud taking place at First Capital; given the facts, the applicable legal standards, and the ample evidence offered by the government at trial about the importance to lenders of the kind of information falsified by First Capital, the choice fell within a "wide range of reasonable professional assistance." Id. at 689.

### (iv) **Interstate Commerce Element**

Whoolery contends that Counsel was ineffective because he stipulated to the interstate commerce element of the charged wire fraud conspiracy without Whoolery's consent. (ECF No. 376-4 at 92-95.) This argument is without merit.

As an initial matter, the stipulation did not affect the outcome of Whoolery's case and caused Whoolery no prejudice. United States v. Potter, 218 F. App'x 132, 138 (3d Cir. 2007). Whoolery does not contend that the government would have been unable to establish that is was reasonably foreseeable at the time the conspiracy was formed that an interstate wire would be used to advance or carry out the scheme. Third Circuit Model Jury Instructions (Criminal) § 6.18.1343-1 (Feb. 2015); United States v. Turley, 891 F.2d 57, 59–60 (3d Cir. 1989) (to prove a conspiracy to commit wire fraud, the government need not prove an explicit agreement among the conspirators to use the interstate mails or wires in furtherance of the conspiracy but merely show that the use of interstate mail or wires was reasonably foreseeable at the time the conspiracy was formed). Even if Whoolery made such a contention in his motion to vacate, the evidence would contradict it. The government offered sufficient evidence to prove that the wire fraud conspiracy involved the actual transmission by interstate wire of communication signals for the purpose of executing the mortgage fraud scheme, even though proof of actual use of interstate commerce was not a necessary element of the charged conspiracy. (ECF No. 212 at 19; Trial Exs. PNC-7, -9, and -13); Lemon v. United States, 335 F.3d 1095 (8th

38

Cir. 2003) (stipulation that substance found was crack cocaine did not prejudice defendant because laboratory report established that the substance was crack cocaine).

In any event, Counsel's decision to enter this stipulation was not objectively unreasonable. The authority to make decisions regarding the conduct of a criminal case is divided between the lawyer and the client. <u>Jones</u>, 463 U.S. at 751. Certain decisions are "fundamental" and reserved to the client, such as deciding whether to plead guilty, waive a jury, testify, or appeal. <u>Id.</u> (citation omitted). Counsel's stipulation to this single element of the charged wire fraud conspiracy is not one of those fundamental decisions, and does not constitute the "practical equivalent of a plea of guilty." <u>Allerdice v. Ryan</u>, 395 F. App'x 449, 452 (9th Cir. 2010) (citing <u>Brookhart v. Janis</u>, 384 U.S. 1 (1966)). "Where a defense attorney makes a tactical decision with constitutional implications, a stipulation does not require the defendant's consent." <u>Poole v. United States</u>, 832 F.2d 561, 564 (11th Cir. 1987) (citation and internal quotation marks omitted).

Counsel made a strategic decision to defend Whoolery on the ground that the government failed to prove, and could not prove, that Whoolery was a member of any wire fraud conspiracy that took place at First Capital. <u>See</u> <u>United States v. Rivas</u>, Civil No. 09-052, 2010 WL 2925801, at *5-6 (E.D. Pa. July 22, 2010) (because the defense was that Rivas had nothing to do with the drug transaction, counsel's stipulation to the nature and amount of drugs could not form the basis of an ineffective assistance of counsel claim). Counsel's stipulation to the interstate commerce element was a tactical decision that aligned with that defense, and fell within the wide range of reasonable

professional assistance; it did not usurp a personal right of fundamental importance to Whoolery.

It was not objectively unreasonable for Counsel to stipulate to the interstate commerce element under the circumstances of this case. Even if it was unreasonable to so stipulate, Whoolery can show no reasonable probability that the outcome of his case would have been different if Counsel had not entered into that stipulation. There was sufficient evidence to prove this element of the charged wire fraud conspiracy beyond a reasonable doubt. This aspect of Whoolery's ineffective assistance of counsel claim fails under both <u>Strickland</u> prongs.

**b. <u>Errors Relating to the Jury Instructions</u>**

Whoolery contends that he was denied his constitutional right to effective assistance of counsel because Counsel made various errors in connection with the jury instructions given by this court to the jury. Whoolery argues that Counsel violated his constitutional rights by failing to request two jury instructions:

(1) a single versus multiple conspiracies jury instruction; and

(2) a limiting instruction about the allegedly missing loan documents.

(ECF No. 376 at 21-47, 65-67; ECF No. 396 at 8-12.) Whoolery maintains that Counsel violated his constitutional rights by failing to object to four jury instructions:

(1) willful blindness;

(2) no ultimate harm;

(3) an <u>Allen</u> charge; and

40

(4) honest services.

(ECF No. 376 at 48-64, 68-72; ECF No. 396 at 45-46.)

As summarized above, Whoolery must show that Counsel's representation with respect to the jury instructions fell below an objective standard of reasonableness, based upon the totality of the circumstances and after affording Counsel's strategic decisions appropriate deference. Strickland, 466 U.S. at 688-89; Ross, 672 F.3d at 210; Roland, 445 F.3d at 681-82. Even if Whoolery can establish that Counsel's performance was unconstitutionally deficient, he must additionally demonstrate a reasonable probability that, but for Counsel's unprofessional errors, he would not have been convicted. Glover, 531 U.S. at 203. Where the evidence is overwhelmingly in support of the jury's verdict, notwithstanding alleged deficiencies of counsel, it is difficult to conclude that there is a showing of prejudice. Strickland, 466 U.S. at 695-96; Williams, 529 U.S. at 391; Baird, 312 F. App'x at 452; Jenkins, 333 F.3d at 155; Buehl, 166 F.3d at 181-82; accord Allen, 555 F.3d at 598.

As discussed below, Whoolery cannot show that he would have been acquitted were it not for Counsel's alleged errors in connection with the jury instructions. Whoolery can make no showing of a reasonable probability that any of the missing or erroneous jury instructions had, or could have had, an effect on the jury's verdict, even if the court presumes that Counsel's performance was unconstitutionally deficient. The evidence of Whoolery's guilt at trial was overwhelming. Upon examination, there is no basis for this court to find that Counsel acted objectively unreasonably in connection with

41

the jury instructions identified above. Whoolery, therefore, cannot establish either prong

of his ineffective assistance of counsel claim.

### (i)  The Allegedly Missing Jury Instructions

#### (a)        Single or Multiple Conspiracies Jury Instruction

Whoolery argues that "the jury would have determined that the single conspiracy

as charged in the indictment did not exist, and would have returned a verdict of acquittal"

if Counsel had requested a jury instruction about single versus multiple conspiracies.

(ECF No. 376 at 21-47; ECF No. 396 at 8-12.)  Whoolery contends that counsel should

have asked this court to include section 6.18.371H of the Third Circuit's Model Criminal

Jury Instructions in the final charge to the jury because the evidence at trial established, if

anything, that multiple conspiracies existed; one at First Capital and one at Financial

Freedom Mortgage, a company formed by two former employees of First Capital around

2004. (ECF No. 376 at 21-22; ECF No. 208 at 52, 59-60.)

The model jury instruction that Whoolery claims Counsel should have requested

reads:

> The indictment charges that *(name)* and the other alleged co-
> conspirators were all members of one single conspiracy *[to commit
> (state offense(s))] [to defraud the United States]*. *(Name)* has argued
> that there were really two *[or more]* separate conspiracies *[one
> between _____ to commit (state offense(s)), and another between
> _____ to commit (state offense(s))]*.  Whether a single conspiracy or
> multiple conspiracies exist is a question of fact that you must decide.

> In order to find *(name)* guilty of the conspiracy charged in the
> indictment, you must find that the government proved beyond a
> reasonable doubt that *(name)* was a member of that conspiracy.  If
> the government failed to prove that *(name)* was a member of the

conspiracy charged in the indictment, then you must find *(name)* not guilty of conspiracy, even if you find that there were multiple conspiracies and that *(name)* was a member of a separate conspiracy other than the one charged. However, proof that *(name)* was a member of some other conspiracy would not prevent you from also finding *(him) (her)* guilty of the conspiracy charged in the indictment, if you find that the government proved beyond a reasonable doubt that *(name)* was a member of the conspiracy charged.

In deciding whether there was one single conspiracy or more than one conspiracy, you should concentrate on the nature of the agreement proved by the evidence. To prove a single conspiracy, the government must prove beyond a reasonable doubt that each of the alleged members or conspirators agreed to participate in what *(he) (she)* knew or should have known was a single group activity directed toward *(a)* common objective*(s)*. The government must prove that there was a single agreement on *(an)* overall objective*(s)*.

Multiple conspiracies are separate agreements operating independently of each other. However, a finding of a master conspiracy that includes other, sub-schemes does not constitute a finding of multiple, unrelated conspiracies. A single conspiracy may exist when there is a continuing core agreement that attracts different members at different times and which involves different sub-groups committing acts in furtherance of an overall objective.

In determining whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies, you should consider whether there was a common goal among the alleged conspirators; whether there existed common or similar methods; whether and to what extent alleged participants overlapped in their various dealings; whether and to what extent the activities of the alleged conspirators were related and interdependent; how helpful each alleged coconspirator's contributions were to the goals of the others; and whether the scheme contemplated a continuing objective that would not be achieved without the ongoing cooperation of the conspirators.

A single conspiracy may exist even if all the members did not know each other, or never sat down together, or did not know what roles all the other members would play. A single conspiracy may

exist even if different members joined at different times, or the membership of the conspiracy changed over time. Similarly, there may be a single conspiracy even though there were different sub-groups operating in different places, or many acts or transactions committed over a long period of time. You may consider these things in deciding whether there was one single conspiracy or more than one conspiracy, but they are not necessarily controlling. What is controlling is whether the government has proved beyond a reasonable doubt that there was one overall agreement on *(a)* common objective*(s)*.

Third Circuit Model Jury Instructions (Criminal) § 6.18.371H (Apr. 2015).

In support of his argument that Counsel's performance was deficient because he did not request the above jury instruction, Whoolery relies upon evidence admitted at trial establishing that Cowden did not use Gray's license to create fraudulent appraisals while working for Whoolery and First Capital, but instead did so while working for Financial Freedom Mortgage. According to Whoolery, this factual scenario required this court to include the above jury instruction, and Counsel's failure to request it violated his constitutional rights.

The evidence Whoolery points to was addressed during the trial. Cowden testified that he used Gray's license, without Whoolery's permission or knowledge, in connection with appraisals that he completed for Financial Freedom Mortgage, but stopped doing so when Whoolery told Cowden that he (Whoolery) "was not paying for me to use Jeanette Gray's name." (ECF No. 207 at 189-91.) The evidence at trial established that Cowden used the names and licenses of appraisers other than Gray to prepare fraudulent appraisals for Whoolery and First Capital. (ECF No. 207 at 178-90.) The evidence at trial further established that Whoolery paid Gray, and later Sheraw, to allow Baldwin to

use their names and licenses to prepare fraudulent appraisals for First Capital. (ECF No. 209 at 153-56, 161-63; ECF No. 211 at 36-39.)

This evidence proved that Cowden was a member of at least two mortgage fraud conspiracies; the Whoolery-First Capital conspiracy, and a similar scheme at Financial Freedom Mortgage. Cowden, in fact, pleaded guilty to participating in yet another mortgage fraud conspiracy, among other crimes. (ECF No. 207 at 172-73); United States v. Cowden, Crim. No. 07-217 (W.D. Pa.) (ECF Nos. 1, 7, 29). Cowden's participation in multiple conspiracies does not disprove that the Whoolery-First Capital conspiracy existed between January 2003 and November 2006, as charged, and that Whoolery was a member of it. The fact that former members of the First Capital conspiracy left and created a separate conspiracy at Financial Freedom Mortgage does not disprove that the Whoolery-First Capital conspiracy existed between January 2003 and November 2006, as charged. A single conspiracy is not transformed into a series of unrelated, multiple conspiracies merely through a change in the conspiracy's membership. United States v. Kelly, 892 F.2d 255, 259 (3d Cir. 1989).

Although the jury instruction that Whoolery requests could have been relevant to determining Cowden's criminal liability, there was no evidence that Whoolery was involved in any conspiracy other than the one at First Capital. Whoolery did not contend at trial that "there were really two [or more] separate conspiracies," and that the conspiracy to which he belonged was not the same conspiracy that was charged in the indictments returned in this case, as the model jury instruction contemplates. Whoolery

offered no evidence at trial in support of such a theory, and proffers none in connection with his § 2255 motion. There was, therefore, no basis on which to include a multiple conspiracies jury instruction in the final charge to the jury.[9] Counsel's failure to request a jury instruction that was unsupported by the evidence cannot be characterized as falling below an objective standard of reasonableness, making it impossible for Whoolery to satisfy the first prong of this ineffective assistance of counsel claim.

Even assuming that Counsel erred by failing to request the instruction, the multiple conspiracies jury instruction that Whoolery now claims Counsel should have requested could not have changed the outcome of Whoolery's trial. Whoolery can establish no reasonable probability that he would have been acquitted if Counsel had requested a multiple conspiracies jury instruction because there was no evidence admitted

---

[9] Regardless of Whoolery's contentions and theories, the record at trial and as proffered in connection with the § 2255 motion, would not have supported a finding that Whoolery was a member of multiple conspiracies under the applicable law. The Court of Appeals for the Third Circuit employs a three-step inquiry to determine whether a series of events constitutes a single conspiracy or several unrelated conspiracies: first, a court examines whether there was a common goal among the conspirators; second, a court looks at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators; and third, a court examines the extent to which the participants overlap in the various dealings. United States v. Greenidge, 495 F.3d 85, 93 (3d Cir. 2007) (citing United States v. Kelly, 892 F.2d 255, 259 (3d Cir. 1989)); see United States v. Mitan, No. 08-760-1, 2009 WL 1651288, at *7 (E.D. Pa. June 11, 2009). Under this test, the activities at First Capital involving Whoolery and his various confederates was a single conspiracy aimed at increasing the fees payable to First Capital. The conspiracy did not depend upon which loan officers were completing loan applications or which appraiser's licensing credentials were being used to submit fraudulent appraisals, all of which changed over the period of the conspiracy. There is no evidence that Whoolery was associated with any mortgage brokerage firm other than First Capital during the pertinent time period.

at trial, and no proffer made by Whoolery with his § 2255 motion, indicating that Whoolery was a member of a conspiracy other than the one charged in the indictments returned in this case. There is no evidence that Whoolery was associated with any mortgage brokerage firm other than First Capital during the pertinent time period. With no reasonable probability of a different outcome discernible, Whoolery cannot establish the prejudice prong of his ineffective assistance of counsel claim.

This aspect of Whoolery's ineffective assistance of counsel claim fails.

**(b) <u>The Limiting Instruction about the Missing Loan Documents</u>**

Whoolery contends that Counsel was ineffective because he did not propose a limiting instruction about the completeness of the loan file documents that were submitted by the government into evidence during trial. (ECF No. 376 at 65-67.) As discussed earlier in this opinion, Whoolery contends that if the jury had access to documents such as good faith estimates, truth in lending statements, underwriting findings, or knowledge that the government was withholding them, it would have shifted the blame from First Capital to the lenders and borrowers for deciding to close the loans, and to the government for withholding evidence. <u>See</u> <u>supra</u> Section IV.A.1.a.ii. It is in this context that Whoolery claims that Counsel's performance was deficient and prejudicial because Counsel did not ask the court to specifically instruct the jury that there were documents missing from the loan files offered into evidence by the government.

As previously discussed, despite Whoolery's repeated contentions to the contrary, there was no basis for the court to have instructed the jury that the government withheld, destroyed, and avoided obtaining exculpatory documents in this case. The government never admitted that it engaged in such conduct, and Whoolery still has proffered no evidence that such misconduct actually occurred in this case. In addition, as explained previously in this opinion, even if the government withheld documents, there is no basis for this court to conclude that the allegedly missing documents were exculpatory or contained valuable impeachment evidence, making the government's conduct inconsequential. It was not objectively unreasonable for Counsel to fail to request an instruction informing the jury that the government failed to produce documents that were not exculpatory or material.

Even accepting Whoolery's theory as true in its entirety, and assuming that Counsel acted unreasonably by failing to request the limiting instruction, Whoolery can make no possible showing of prejudice. As discussed earlier in this opinion, proof that the borrowers and lenders were negligent, aware of or complicit in Whoolery's fraud, or even committed actual fraud themselves in some way, would not have exonerated Whoolery for his role in the Whoolery-First Capital conspiracy. Moleski, 2016 WL 231537, at *2 (citing Neder, 527 U.S. at 25, Coffman, 94 F.3d at 333, and Coyle, 63 F.3d at 1244); see supra Section IV.A.1.a.ii. Even if the jury was informed that documents proving these facts were missing from the loan files submitted into evidence by the government, that information would have provided no basis for the jury to acquit

Whoolery of the charged wire fraud conspiracy.  In any event, Counsel cross-examined various witnesses at trial about the kinds of documents that would be found in a completed loan file, about whether the borrowers were aware of First Capital's fees prior to closing, and about whether the lenders exercised discretion in deciding whether to fund a particular loan.   The jury was aware of Whoolery's theories that the lenders and borrowers should be held responsible for closing loans that should not have been funded, not First Capital.  In this context, whether or not documents were missing from the loan files, and whether or not Counsel asked this court to point this out to the jury, could have had no effect on the verdict.

Under the circumstances, Counsel's failure to request this instruction was objectively reasonable, and, in any event, caused Whoolery no prejudice.  This purported error, therefore, cannot support Whoolery's ineffective assistance of counsel claim.

### (ii)  The Allegedly Erroneous Jury Instructions

#### (a) Willful Blindness

Whoolery claims that Counsel was ineffective because he failed to object to the willful blindness jury instruction given to the jury in this case. (ECF No. 376 at 56-61.) According to Whoolery there was insufficient evidence to justify instructing the jury on this theory, and, in any event, the instruction was worded incorrectly permitting the jury to convict him without finding that he had the requisite mental state.  Both contentions are facially without merit.

One of Whoolery's defenses at trial was that any fraud committed at First Capital occurred without his knowledge because he was regularly out of the office and employees hid their conduct from him. Whoolery continues to press this same theory in his § 2255 motion. In the face of this defense, a willful blindness jury instruction was appropriate, and necessary, in order to assist the jury in assessing Whoolery's criminal liability if they believed that Whoolery had no actual knowledge of the fraud occurring at First Capital. United States v. Caraballo-Rodriquez, 786 F.3d 418, 426 (3d Cir. 2013); United States v. Tai, 750 F.3d 309, 314-15 (3d Cir. 2014); United States v. Wert-Ruiz, 228 F.3d 250, 255 (3d Cir. 2000).

Even assuming for the sake of argument that Counsel's performance was deficient for failing to object to the inclusion or wording of this instruction, Whoolery makes no showing that he suffered prejudice as a result. The evidence submitted at trial and proffered with Whoolery's § 2255 motion does not support Whoolery's theory that he was unaware of the rampant fraudulent conduct occurring at First Capital. Every witness who had knowledge about the Whoolery-First Capital conspiracy identified Whoolery as the leader of that conspiracy. As will be examined in more detail in section IV.A.1.c.iv. of this opinion, the additional evidence offered by Whoolery in connection with his § 2255 motion does not contradict the substantial and consistent trial testimony that established Whoolery's actual knowledge of the mortgage fraud conspiracy at First Capital, making the willful blindness jury instruction ultimately superfluous.

By way of example only, Whoolery submits a declaration, dated July 31, 2015, from Sheraw, that disavows that he had any agreement with Whoolery to allow fraudulent appraisals to be performed using his license. (ECF No. 396 at 52-54.) Sheraw pleaded guilty to the same wire fraud conspiracy with which Whoolery was charged, claiming that he was willfully blind to Baldwin's use of his licensing credentials to prepare fraudulent appraisals. (ECF No. 143.) Even if the statements in Sheraw's declaration are technically true and in accord with the guilty plea that he entered, they do not contradict Gray's testimony, which was corroborated by Baldwin and by volumes of documentary evidence which established that Whoolery did have an agreement with Gray to pay her to allow Baldwin to use her licensing credentials to prepare fraudulent appraisals. This evidence was sufficient for the jury to find that Whoolery had actual knowledge of the mortgage fraud scheme at First Capital, even if the jury were to have believed Sheraw's claims that, unlike with Gray, Whoolery had no such agreement with Sheraw. Sheraw's declaration does not establish that Whoolery would have been acquitted if Counsel objected to the willful blindness jury instruction. None of the other allegedly exculpatory evidence proffered by Whoolery in connection with his § 2255 motion shows that the result of Whoolery's trial would have been different if Counsel objected to the willful blindness jury instruction. There was overwhelming evidence establishing that Whoolery had actual knowledge of the fraud occurring at First Capital, making any purported error by Counsel related to a willful blindness jury instruction inconsequential to the jury's verdict.

Just as Whoolery can make no showing that he was prejudiced by Counsel's failure to object to the inclusion of the willful blindness jury instruction, there is likewise no basis for this court to find that Whoolery was prejudiced by Counsel's failure to object to the wording of the instruction given to the jury. The instruction submitted to the jury substantially followed section 5.06 of the Third Circuit's Model Criminal Jury Instructions. This supports the conclusion that the instruction was correctly phrased. United States v. Petersen, 622 F.3d 196, 208-09 (3d Cir. 2010). Whoolery points out that in one instance the court instructed the jury that "[i]t is not enough that Lewis Whoolery may have been stupid or foolish or may have acted out of inadvertence or accident." (ECF No. 376 at 57; ECF No. 213 at 94.) This statement omitted the word "reckless" from the model instruction's directive that "[i]t is not enough that [defendant] may have been reckless or stupid or foolish, or may have acted out of inadvertence or accident." Although Whoolery is correct that the court's charge differs from the model charge in this one manner, it does not follow that the jury was improperly instructed with respect to the mental state required to convict Whoolery. The willful blindness charge otherwise reproduced the model instruction verbatim, and included repeated explanations of the circumstances under which the jury could apply this theory of criminal liability. The instruction, when viewed in its entirety and in conjunction with the complete jury charge, which included ample and adequate explanation of the state of mind necessary for the jury to convict Whoolery, was not improper. Whoolery can make no showing of a reasonable probability that he would have been acquitted if the willful blindness jury

52

instruction had included the word "reckless" in the one passage that he identifies in his §

2255 motion.

Under the circumstances, Counsel's failure to object to this instruction was

objectively reasonable, and, in any event, caused Whoolery no prejudice. This purported

error, therefore, cannot support Whoolery's ineffective assistance of counsel claim.

### (b) No Ultimate Harm

Whoolery contends that Counsel was ineffective because he failed to object to the

court's inclusion of a "no ultimate harm" instruction within the good faith defense jury

instruction. (ECF No. 376 at 62-64.) According to Whoolery, this statement "had the

effect of confusing the jury into believing the [sic] could accept Whoolery's [good faith]

defense, but still convict." (Id. at 63.) Whoolery's contention is without merit.

The court included a good faith defense jury instruction, which followed section

5.07 of the Third Circuit's Model Criminal Jury Instructions. That model instruction

includes an explanation about how the good faith defense and honestly-held beliefs relate

to each other. The portion of the good faith jury instruction to which Whoolery objects is

found in the model jury instructions, which is strong evidence that the court committed

no error by including it, and, in turn, that Counsel was not ineffective for failing to object

to it. Petersen, 622 F.3d at 208-09. The court's instructions differ from the model

instructions only in that the court included a statement explaining that, in the context of

this case, such an honestly-held belief could include a belief that no money would

ultimately be lost. (ECF No. 213 at 102.) The court's statement of the law, which

mirrored the model jury instruction and added an explanatory phrase, was factually and legally correct and instead of confusing the jury, provided the jury a framework in which to apply the good faith defense to this particular case. Counsel's performance cannot be characterized as deficient for failing to object under these circumstances. Any such objection would have been meritless, and futile.

In any event, even if Counsel' representation was deficient by not objecting to the instruction, Whoolery can establish no prejudice. The evidence at trial was overwhelming that Whoolery did not act in good faith in his management and control of First Capital. None of the additional evidence that Whoolery submits with his § 2255 motion contradicts the trial record or can overcome the weight of evidence proffered at trial. By way of example only, even if the jury heard evidence that Whoolery fired two or three individuals, including his mother, because they allegedly engaged in specific instances of fraudulent misconduct, it does not follow that Whoolery acted in good faith in all other circumstances relevant to his operations of First Capital, as Whoolery contends. (ECF No. 376-5 at 40-41; ECF No. 376-6 at 1-3); see supra Section IV.A.1.c.iv. Under the circumstances, any error related to the wording of the good faith defense jury instruction could not have affected the outcome of the case.

Counsel's failure to object to the wording of this jury instruction was objectively reasonable, and, in any event, caused Whoolery no prejudice. This purported error, therefore, cannot support Whoolery's ineffective assistance of counsel claim.

### (c) *Allen* **Charge**

Whoolery contends that Counsel was ineffective because he did not object to the court's inclusion of a modified <u>Allen</u> charge in the court's final instructions to the jury. (ECF No. 376 at 69.) An <u>Allen</u> charge, or modified <u>Allen</u> charge, is one that directs jurors to reconsider their positions and continue deliberations after a jury reports that it is unable to reach unanimity. <u>Mitchell v. Wenerowhicz</u>, No. 11-1169, 2014 WL 2565667, at *8, n.2 (M.D. Pa. June 6, 2014) (citing <u>Allen v. United States</u>, 164 U.S. 492 (1896), and <u>Commonwealth v. Greer</u>, 951 A.2d 346 (Pa. 2008)); <u>Third Circuit Model Jury Instructions (Criminal)</u> § 9.05 (Feb. 2015). Contrary to Whoolery's contention, this court did not include an <u>Allen</u> charge in the final jury instructions, making it impossible for Counsel's failure to object to constitute ineffective assistance of counsel.

Whoolery complains about the following passage in the final jury instructions:

> It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. Remember, at all times, you are not partisans. You are judges – judges of the facts. Your sole interest is to seek the truth from the evidence in this case.

(ECF No. 213 at 157; ECF No. 376 at 68-69.) These instructions are akin to those suggested by Third Circuit Model Criminal Jury Instruction section 3.16 concerning the

jury's duty to deliberate. The passage is not an <u>Allen</u> charge. The instruction does not

indicate, or intimate, that the jury must continue deliberating in the event that a

unanimous verdict cannot be initially reached. The instruction does not make any

reference to reconsidering the evidence in light of the majority or minority views. The

charge, instead, consists of generalized directives about how the jurors should go about

their deliberations. The charge was proper and Counsel's failure to object to it on the

ground that it was an improper <u>Allen</u> charge or modified <u>Allen</u> charge was objectively

reasonable because such an objection would have been meritless and frivolous.

Even if Counsel acted unreasonably with respect to this jury instruction, Whoolery

can establish no reasonable probability that he would not have been convicted had

Counsel objected to it. If this passage was excised entirely from the jury's instructions,

Whoolery can establish no reasonable probability that the jury would have acquitted him.

This purported error, therefore, cannot support Whoolery's ineffective assistance of

counsel claim.

### (d) **Honest Services**

Whoolery claims that Counsel was ineffective because he requested an honest

services jury instruction. (ECF No. 376 at 48-50.) On direct appeal, the Court of Appeals

for the Third Circuit rejected Whoolery's contention that the jury charge was improper

because it included an instruction on honest services fraud on two grounds: (1) the

invited-error doctrine (i.e., Whoolery requested the instruction); and (2) lack of prejudice.

<u>Whoolery I</u>, 579 F. App'x at 81.  With respect to the second ground, the court of appeals stated:

> Second, the instruction did not prejudice Whoolery.  The jury instructions presented honest services as one of three things that the scheme to defraud could have targeted.  However, there was no basis in either the indictment or the government's case at trial from which the jury could have understood that it was deciding an honest services fraud count.  The jury instructions did not explain honest services fraud, but gave a detailed explanation of pecuniary fraud.  There was sufficient evidence for the jury to find pecuniary fraud.  Indeed, Whoolery has not challenged the sufficiency of the government's evidence.  Thus, Whoolery cannot show that inclusion of the honest services fraud instruction, which he sought, prejudiced him and therefore constituted plain error.

<u>Id.</u>  In light of the appellate court's ruling, Whoolery's insistence that the jury was wrongfully instructed that they must base a conviction upon an honest services fraud theory is untenable. (ECF No. 376 at 50.)  The court of appeals' prior finding that Whoolery was not prejudiced by the inclusion of a reference to honest services fraud in the jury instructions renders his ineffective assistance of counsel claim based upon this same instruction meritless.  This court cannot deem Counsel to have acted unreasonably by failing to object to, or requesting, a jury instruction that the court of appeals determined on direct appeal did not prejudice Whoolery.

In connection with this asserted error Whoolery argues, nevertheless, that the result of his trial would have been different, and the effect of the honest services jury instruction ameliorated, if had Counsel brought forth exculpatory evidence legitimizing Baldwin's fraudulent appraisals on the ground that she was acting as an apprentice appraiser and demonstrating to the jury that the lenders and borrowers, and not

57

Whoolery, should be held responsible for funding any loans that should not have been funded. (ECF No. 376 at 54-55.) These arguments are without consequence, and are in large part misplaced. As will be discussed in more detail in section IV.A.1.c.iii(a), the evidence directly contradicts Whoolery's legitimate apprentice appraiser theory. Similarly, as discussed elsewhere in this opinion, even if Counsel established that the lenders and borrowers were ultimately responsible for deciding to close a loan, that fact would have had no effect on what the appellate court characterized as "sufficient evidence for the jury to find pecuniary fraud" on the part of Whoolery. Whoolery I, 579 F. App'x at 81; see e.g., supra Section IV.A.1.a.ii and c.ii. The borrowers' and lenders' participation, or complicity, in the fraud would not exonerate Whoolery. Moleski, 2016 WL 231537, at *2 (citing Neder, 527 U.S. at 25, Coffman, 94 F.3d at 333, and Coyle, 63 F.3d at 1244). This allegedly missing exculpatory evidence, therefore, would have had no effect on the jury's understanding of the court's instructions, and cannot overcome the court of appeals' prior determination that the reference to honest services fraud in the jury instructions caused Whoolery no prejudice in this case.

Counsel's representation with respect to this jury instruction caused Whoolery no prejudice. This alleged error, therefore, cannot support Whoolery's ineffective assistance of counsel claim.

### (iii) **Cumulative Effect**

Even if Counsel committed errors in connection with the jury instructions,

Whoolery cannot establish that the cumulative effective of non-prejudicial alleged errors

would have resulted in his being acquitted.  The evidence of Whoolery's guilt at trial was

overwhelming. Strickland, 466 U.S. at 695-96; Williams, 529 U.S. at 391; Baird, 312 F.

App'x at 452; Jenkins, 333 F.3d at 155; Buehl, 166 F.3d at 181-82; accord Allen, 555

F.3d at 598.

### c.   **Errors Relating to the Evidence Gathered and Presented**

Whoolery contends that he was denied his constitutional right to effective

assistance of counsel because Counsel committed various errors relating to the

investigation of this case, and the presentation of evidence to the jury.  Whoolery devotes

more than 200 pages of the brief in support of his § 2255 motion to the many

investigatory and evidentiary errors allegedly committed by Counsel. (ECF No. 376 at

73-100; ECF No. 376-2 at 1-63; ECF No. 376-4 at 1-100; ECF No. 376-5 at 1-20, 29-96.)

The court groups the alleged evidentiary errors into the following categories and will

discuss each in turn:

> (1) failure to present evidence challenging Baldwin's assertion that she did not speak to Whoolery from 2001 until 2003;

> (2) failure to obtain documents or present testimonial evidence establishing that lenders and borrowers ultimately decided whether to close a loan, not Whoolery or First Capital;

> (3) failure to present evidence establishing that apprentice appraisers and drive-by appraisals are permissible practices;

(4) failure to obtain and present evidence of, and present a good faith defense based upon, Whoolery's lack of knowledge of the alleged fraud occurring at First Capital between 2003 and 2006, including evidence about Whoolery's history of not tolerating fraud at First Capital; and

(5) entering into an improper evidentiary stipulation.

As summarized above, Whoolery must show that Counsel's representation with respect to these purported evidentiary errors fell below an objective standard of reasonableness, based upon the totality of the circumstances and after affording Counsel's strategic decisions appropriate deference. Strickland, 466 U.S. at 688-89; Ross, 672 F.3d at 210; Roland, 445 F.3d at 681-82. Even if Whoolery can establish that Counsel's performance was unconstitutionally deficient, he must additionally demonstrate a reasonable probability that, but for Counsel's errors, he would not have been convicted. Glover, 531 U.S. at 203. Where the evidence is overwhelmingly in support of the jury's verdict, notwithstanding alleged deficiencies of counsel, it is difficult to conclude that there is a showing of prejudice. Strickland, 466 U.S. at 695-96; Williams, 529 U.S. at 391; Baird, 312 F. App'x at 452; Jenkins, 333 F.3d at 155; Buehl, 166 F.3d at 181-82; accord Allen, 555 F.3d at 598.

Whoolery cannot show that Counsel's representation was objectively unreasonable with respect to the investigation of this case and the presentation of the evidence; therefore, Whoolery cannot establish the first prong of his ineffective assistance of counsel claim. Even if Counsel's representation was constitutionally deficient in this regard, Whoolery cannot show that he would have been acquitted were it not for

Counsel's errors. Had Counsel presented evidence on every one of the topics identified above, the outcome of Whoolery's trial would not have been different. None of the categories of evidence or legal theories listed above would have absolved Whoolery of his participation in the charged wire fraud conspiracy or contradicted the evidence admitted at trial that proved the same. There was overwhelming evidence at trial that Whoolery participated in, and directed, a conspiracy at First Capital to falsify income and asset documents and to inflate the fair market value of appraised properties in order to have loans funded so that fees would be paid to First Capital. Even if every piece of evidence that Whoolery identifies was admitted into evidence, Whoolery's conviction for wire fraud conspiracy would still be supported by overwhelming evidence. Whoolery, therefore, cannot make the required showings to sustain an ineffective assistance of counsel claim. The court, nevertheless, considers each of Whoolery's contentions in turn.

### (i) **Evidence Challenging Baldwin's Timeline Testimony**

Baldwin testified at trial that sometime after she began working with Whoolery in the mortgage industry they had an argument, severed their business and personal relationships, and did not speak for about three years. (ECF No. 209 at 150, 153.) Baldwin explained that Whoolery thereafter bought out her 50% share in their business by making the monthly payments on her automobile lease. (ECF No. 210 at 6-9, 48.) According to Baldwin's chronology of events, she stopped speaking with Whoolery in 2000 or 2001 and only began speaking with him again when their mother approached Baldwin to ask her if she would prepare appraisals using Gray's licensing credentials for

First Capital, which was in mid- to late-2003. (ECF No. 209 at 150, 153; ECF No. 210 at 7-9.)

Whoolery contends that several pieces of evidence would have contradicted Baldwin's testimony about this proffered timeline. Whoolery contends that Baldwin and he could not have stopped speaking to each other in 2000 or 2001, and started speaking again in 2003, as Baldwin testified, because First Capital was not created until 2002. Although not proffering any direct evidence in support of his alternative timeline, according to Whoolery, Whoolery and Baldwin were actually not speaking between 2003 and 2006, making it impossible for Whoolery and Baldwin to be members of the charged wire fraud conspiracy that took place during that time period. Whoolery also contends that by correcting the timeline Counsel could have proven that the checks Whoolery wrote to Baldwin between 2003 and 2006 were not payments for fraudulent appraisals, as the government asserted at trial, but represented the monthly payments Whoolery made in order to buy out Baldwin's 50% share of their business. This evidence, Whoolery explains, would have led to his acquittal, and Counsel's failure to secure the admission of this evidence violated his Sixth Amendment rights.

As an initial matter, even if Whoolery and Baldwin were not speaking to each other between 2003 and 2006, that fact alone would not disprove Whoolery's participation in the charged wire fraud conspiracy. The conspiratorial agreement to commit wire fraud need not be verbal, and can be proven by circumstantial evidence of the participants' conduct. United States v. John-Baptiste, 747 F.3d 186, 203-04 (3d Cir.

2014); United States v. Whiteford, 676 F.3d 348, 357 (3d Cir. 2012); Third Circuit Model

Jury Instructions (Criminal) § 6.18.371C (Apr. 2015); but see ECF No. 210 at 10

(Baldwin testifying that she completed no appraisals for Whoolery when they were not

speaking to each other). In any event, the record, including uncontroverted testimonial

and documentary evidence, reflects that Whoolery and Baldwin did have personal and

professional relationships between 2003 and 2006. (ECF No. 209 at 153-54, 156-59, 166-

68; ECF No. 210 at 13; ECF No. 211 at 37.) None of the evidence proffered by

Whoolery in connection with his § 2255 motion contradicts any of this evidence.

In addition, none of the evidence proffered by Whoolery in connection with his

§ 2255 motion supports the inference that the checks written by Whoolery to Baldwin

between 2003 and 2006 represented payments for Bladwin's 50% share of the business.

To the contrary, the exhibits offered into evidence at trial reflected that the names of

borrowers for whom appraisals were prepared in the subject line of many of these checks,

which directly contradicts Whoolery's present theory. (ECF No. 209 at 176-80, 186-87;

ECF No. 210 at 45-49, 51-52.)

Before proceeding with an analysis of Whoolery's arguments about Counsel's

allegedly deficient representation in this regard, the court points out several things about

the purported importance of Baldwin's timeline testimony.

First, the record establishes, and Whoolery does not dispute, that Whoolery

attended a business dinner with Baldwin, Gray, and others, on Mt. Washington in

Pittsburgh, Pennsylvania in the summer of 2003, and that Baldwin attended Whoolery's

wedding in Las Vegas, Nevada in December 2003. (ECF No. 209 at 153-54; ECF No. 211 at 37; ECF No. 354-9 ¶ 4(D).) Although Whoolery contends in his briefing that he did not actually speak to his sister at these events because they were estranged, this is strong, and uncontroverted, evidence that Whoolery's revised timeline theory of acquittal would not have been provable at trial, even if Counsel presented it as Whoolery contends he should have.

Second, Baldwin explained that she began working with Whoolery out of an office in his home, before First Capital was created. Baldwin testified that Whoolery asked her to help him create a mortgage business because her credit was better than his. (ECF No. 209 at 148-49; ECF No. 210 at 48.) Based upon this record, the date on which First Capital was "created" or "licensed" is not necessarily indicative of when Baldwin and Whoolery established, severed, and re-established their business relationship. Whoolery proffers no evidence with his § 2255 motion to explain these facts.

Third, there was sufficient evidence to convict Whoolery even if the jury assigned no credibility to Baldwin's testimony. The complete impeachment of Baldwin's timeline testimony would not have changed the testimony of the dozens of other witnesses who implicated Whoolery in the charged fraud conspiracy, or the numerous documents that did the same.

Turning now to Whoolery's specific contentions, Whoolery faults Counsel for failing to present the following evidence to establish that Whoolery was not speaking to Baldwin during the time of the charged wire fraud conspiracy: (1) the "articles of

incorporation" for First Capital; (2) the testimony of Michael Clifford; (3) the report of

Michael Clifford; and (4) the testimony of Lewis Whoolery, Sr.  To reiterate a critical

point, none of this evidence, or any other evidence proffered by Whoolery with his § 2255

motion, provides substantive, direct evidence about when Whoolery and Baldwin were or

were not speaking, or the timing or terms of Whoolery's buy-out of Baldwin's 50% share

in their business.  Whoolery identifies no witness who would have testified at trial, based

upon first-hand knowledge, that Whoolery and Baldwin were not on speaking terms

between 2003 and 2006, and conducted no business with each other during that time.

Whoolery identifies no document that would establish this purported fact.  The evidence

listed above could have only been used at trial to challenge or impeach Baldwin's version

of the timeline.  Counsel, however, repeatedly challenged Baldwin about her recollection

of the timeline on cross-examination. (ECF No. 210 at 6-9, 17-20.)  Whoolery's

preference that Counsel have conducted his cross-examination of Baldwin in a particular

way, or using particular documents, does not equate to a violation of his constitutional

rights.  For the reasons that follow, Counsel's failure to present this evidence to the jury

could not have been objectively unreasonable or been the reason for his conviction even if

it was.

> **(a) Articles of Incorporation and Pennsylvania Department of**
>
> **State Representative:** According to Whoolery, the "articles of
>
> incorporation" indicate that First Capital was created in January
>
> 2002. (ECF No. 354-1.)  Whoolery claims that Counsel was

ineffective because he did not use this document, and the authenticating testimony of a representative from Pennsylvania's Department of State, to disprove Baldwin's timeline, and, in turn, substantiate Whoolery's contention that Baldwin and he stopped speaking in 2003, and did not begin speaking again until 2006.

As an initial matter, what Whoolery refers to as First Capital's "articles of incorporation" is a one-page printout from the Pennsylvania Department of State's website reflecting that a domestic limited liability company named First Capital Home Equity, LLC was "created" on January 16, 2002. Presumably, Whoolery believes that the document would have been admissible through the testimony of the unidentified representative from the Pennsylvania Department of State.

Whoolery proffers no witness, however, who would be qualified to testify about the meaning of this document in the context of Whoolery's and Baldwin's business and personal relationships. A state official's confirmation of the information found on the government website would provide no information about when Whoolery and Baldwin began working together to create a mortgage company, or whether the company reflected in the state record is the company created by Baldwin for Whoolery

or is a company created independently by Whoolery after Baldwin and he stopped speaking. The document provides no information about the ownership arrangement for the company. Whoolery never contends that he would have taken the stand at trial to explain these facts, and he proffers no other witnesses with first-hand knowledge about these matters. The document is not probative of when Baldwin and Whoolery were not speaking to each other.

Whoolery contends that Counsel should have used the website printout to impeach Baldwin about her proffered timeline, explaining that Baldwin would have been "dead in the water" and Whoolery would have been acquitted. (ECF No. 376-4 at 51.) Simply put, Whoolery contends that upon confrontation Baldwin would have had to admit that she did not leave First Capital until early 2003, and, therefore, did not speak to Whoolery from 2003 to 2006, which is the period of the charged conspiracy.

Counsel did impeach Baldwin about her recollection of the chronology of events on cross-examination. (ECF No. 210 at 6-9, 17-20.) On direct and cross-examination, Baldwin expressed confusion and lack of recollection about what year Whoolery

increased her share in the business from 25% to 50%, when she and Whoolery stopped speaking, and for how long they did not speak. (ECF No. 209 at 150, 153-55; ECF No. 210 at 6-8, 10-12, 17-19, 28, 40-43, 50-51.) Counsel confronted Baldwin with a letter she wrote to this court in advance of her sentencing claiming certainty at that time about some of these dates in order to challenge her trial testimony about these matters. (ECF No. 210 at 14-15, 17-18, 40-41; ECF No. 354-40.) Baldwin acknowledged that she was "cloudy" about dates, but consistently testified that she started speaking to Whoolery again in the summer of 2003, because that is when their mother approached her about using Gray's license to prepare appraisals for First Capital, which was part of her mother's effort to reunite her children. (ECF No. 209 at 153-55; ECF No. 210 at 8, 9, 13-14, 23-25, 40-41.) Documentary and independent testimonial evidence corroborate this date. (ECF No. 209 at 153-54, 158-59 (and trial exhibits); ECF No. 211 at 37.)

Baldwin was impeached at trial about the inconsistencies in her testimony concerning the chronology of events, as well as about her bias and motivation to testify against Whoolery. Given that Baldwin never faltered in her testimony that she began

speaking to Whoolery again in 2003, which is the critical date

and a fact that was corroborated by substantial testimonial and

documentary evidence at trial, ECF No. 209 153-54, 158-59 (and

trial exhibits); ECF No. 211 at 37, confronting Baldwin with the

department of state record could not have materially advanced

her impeachment.

Counsel was not objectively unreasonable in failing to use

this document to impeach Baldwin.  In any event, Whoolery

cannot show a reasonable probability that he would not have

been convicted had Baldwin been impeached with this document.

Baldwin's testimony was not necessary in order to secure a

conviction.

(b) **<u>Michael Clifford's Report and Testimony</u>:**  Whoolery

contends that Counsel was unconstitutionally ineffective because

he failed to call Michael Clifford ("Clifford"), who was an

investigator with the Pennsylvania Department of Banking and

prepared a report about First Capital sometime after September

2008. (ECF No. 376-3 at 25-31; ECF No. 354-51.)  Whoolery

argues that Clifford's testimony would have aided the jury in

reaching the conclusion that the alleged conspiracy "<u>did</u> <u>not</u>

include Lewis Whoolery." (ECF No. 376-2 at 27 (emphasis in

original).)  According to Whoolery, Clifford's testimony and report would have contradicted Baldwin's proffered timeline of events because it states that First Capital was not licensed until 2002.[10]  In response, the government notes that Clifford's report would have been inadmissible hearsay, and that his testimony about the timeline of events would have been inconsequential because a) it was undisputed that Whoolery was in "firm control" of First Capital by 2003, when the charged conspiracy began, and b) the banking department's reviews of First Capital occurred after the time of the charged conspiracy. (ECF No. 394 at 23-24.) The government's opposition, in large part, misses the mark.

Clifford's report recites that First Capital's mortgage brokerage licenses were issued in March 2002.  Whoolery contends that this statement, like the "articles of incorporation," proves that Baldwin and he could not have stopped speaking in 2000 or 2001, as Baldwin contends, which, in turn, supports Whoolery's contention that Baldwin and he were not speaking between 2003 and 2006.  Again, however, Whoolery identifies

---

[10] Whoolery also contends that the report would have bolstered his good faith defense by proving that the Pennsylvania Department of Banking reviewed First Capital's records in 2007 and 2008 but found no violations.  This argument will be addressed in section IV.A.1.c.iv(e).  The court preliminarily notes, however, that Whoolery proffers no evidence about what files were reviewed by the department or the scope or purpose of the department's review.

no witness who would have testified based upon first-hand knowledge that Baldwin and Whoolery were not speaking between 2003 and 2006; a fact that is, in any event, repeatedly and consistently belied by the trial record.

Putting this fundamental defect in Whoolery's argument aside, as with the department of state record, Whoolery fails to establish how he could secure the admission of Clifford's report or testimony. The report is hearsay and Whoolery does not identify an exception pursuant to which the report could be admitted as substantive evidence. In addition, the ability to secure Clifford's testimony is questionable given that the report indicates that Clifford, in 2008, was leaving the employ of the Pennsylvania Department of Banking. Whoolery makes no showing that Clifford would have been available to testify at trial in 2013 on behalf of the department if necessary.

Regardless, even if the report was substantively admissible, the fact that First Capital was licensed in early 2002 does not establish when Baldwin and Whoolery were not speaking. Baldwin and Whoolery had a business relationship before First Capital was created. (ECF No. 209 at 148-49; ECF No. 210 at 48.) Based upon this record, the date of First Capital's licensure

is not indicative of when Baldwin and Whoolery created, severed, and re-established their business relationship. Clifford, even if he testified, would have no knowledge about any of these facts.

Turning to the impeachment value of the report, as discussed above, Baldwin testified that she was unsure about when she stopped speaking to Whoolery and for how long they were estranged, but was consistent with respect to the fact that they began speaking again in 2003 in connection with the plan to use Gray's license to prepare appraisals. This date is corroborated by the testimony of Gray. (ECF No. 211 at 36-41.) The addition of this document to Baldwin's cross-examination, like the addition of the "articles of incorporation," would not have materially advanced her impeachment. Counsel conducted a thorough and effective impeachment of Baldwin that drew into question her recollection of pertinent dates and attacked her credibility on several points. (ECF No. 210 at 6-12-15, 17-20, 23-25, 28, 40-43, 50-51; ECF No. 354-40.) Confronting Baldwin with the department of banking record would not have materially advanced her impeachment, or contradicted the independent

testimonial and documentary evidence that established that

Baldwin and Whoolery began speaking again in 2003.

Counsel was not objectively unreasonable in failing to seek

the admission of Clifford's report and testimony. In any event,

Whoolery cannot establish a reasonable probability that he would

not have been convicted had Baldwin been impeached with the

document because Baldwin's testimony was not necessary in

order to secure a conviction.

**(c) <u>Testimony of Lewis Whoolery, Sr.:</u>** Whoolery contends that

Counsel was unconstitutionally ineffective because he failed to

elicit meaningful testimony from Lewis Whoolery, Sr.

("Whoolery, Sr.") at trial. According to Whoolery, Whoolery,

Sr., who is Baldwin's and Whoolery's father, could have testified

about prior inconsistent statements that Baldwin made to him

about when First Capital was created, the terms under which

Whoolery bought out Baldwin's 50% share in their business, and

when Baldwin and Whoolery were not speaking. (ECF No. 376-4

at 6-10.)[11]  Whoolery argues that his constitutional rights were

violated because Counsel failed to confront Baldwin with the

allegedly inconsistent statements that she made to her father so

that Whoolery, Sr. could testify about her prior out-of-court

statements at trial.

In support of these arguments, Whoolery cites to two

declarations and one letter written by Whoolery, Sr. several

months to several years after Whoolery's trial. (ECF No. 354-9

through -11.)  These submissions reflect that Whoolery, Sr. has

no first-hand knowledge concerning any of the matters that

Baldwin allegedly offered false testimony about at Whoolery's

trial.  Whoolery, Sr. asserts only that Baldwin made certain

statements to him that are allegedly contrary to Baldwin's trial

testimony.  Whoolery, Sr.'s testimony, therefore, could have

been offered only to impeach Baldwin, not to establish the truth

of Whoolery's version of the facts. FED. R. EVID. 801(c)(2);

United States v. Console, 13 F.3d 641, 656 (3d Cir. 1993); Bailey

---

[11] Whoolery additionally contends that Whoolery, Sr. could have impeached Barry Baldwin's testimony about a confrontation that Whoolery had with Barry Baldwin in the fall of 2004 at Whoolery, Sr.'s hunting camp.   Even under Whoolery's version of the facts, Barry Baldwin made no statements to (or in the presence of) Whoolery, Sr. about when Whoolery and Kim Baldwin were not speaking.  This aspect of Whoolery, Sr.'s testimony is therefore not relevant for present purposes.  Barry Baldwin's testimony, and Whoolery, Sr.'s purported ability to impeach it, is examined in section IV.A.1.c.iv(c) of this opinion.

v. B.S. Quarries, Inc., No. 13-cv-3006, 2016 WL 3382007, at *1

(M.D. Pa. June 14, 2016). Whoolery fails to recognize this

important legal distinction about the value of Whoolery, Sr.'s

testimony.

This court previously considered the impeachment value of

Whoolery, Sr.'s contention that Baldwin lied at trial in ruling on

Whoolery's motion for a new trial. In that context, the court

found:

> The evidence of defendant's guilt admitted at trial, independent of Baldwin's testimony, was overwhelming. Many co-conspirators, in addition to Baldwin, testified that defendant was involved in the mortgage fraud scheme. Volumes of documentary evidence were admitted into the record showing defendant's involvement in the fraud of which he was convicted. There can be no denying that Baldwin was a witness against defendant, but she was by no means the only, or even an especially crucial, witness against him. Defendant's father's testimony that Baldwin admitted to him that she lied, assuming that defendant could gain admission of that testimony into evidence, can only be considered cumulative impeachment evidence to a jury that was, and would again be, made aware that Baldwin pleaded guilty to participating in the same mortgage fraud conspiracy that defendant was being accused of, and was testifying against defendant in order to obtain a lenient sentence. (ECF No. 209 at 152-53.)

> As stated above, even if Baldwin [was] proven to be an admitted liar, or if defendant's father [was] to offer testimony to contradict Baldwin's testimony on certain factual matters, the other evidence at trial establishing defendant's guilt was overwhelming. In

> the face of the many co-conspirators' testimony, and
> the volumes of documentary evidence that implicated
> defendant in the conspiracy of which he was convicted
> at trial, this purportedly "new" evidence about
> Baldwin's lies is substantively inconsequential and
> merely cumulative impeachment evidence .

(ECF No. 338 at 5, 7.)  The Court of Appeals for the Third Circuit affirmed this court's ruling and noted that Whoolery failed to show that the jury probably would have reached a different verdict if it had been privy to Whoolery Sr.'s testimony impeaching Baldwin. Whoolery II, 625 F.App'x at 26-27.  For the same reasons, Counsel's failure to secure the admission of the testimony of Whoolery, Sr. cannot have caused Whoolery any prejudice.

Even if Counsel acted objectively unreasonable in failing to lay a proper foundation for the admission of Whoolery, Sr.'s testimony about Baldwin's prior statements to him, Whoolery cannot establish a reasonable probability that this error affected his verdict.  Overwhelming evidence of Whoolery's guilt was offered at trial, and the complete evisceration of Baldwin's credibility would not have affected, discredited, or disproved that evidence.

### **(ii) Evidence Establishing Lender and Borrow Responsibility**

Whoolery contends that Counsel was unconstitutionally ineffective because he failed to obtain and present evidence and witnesses that would have proven to the jury that lenders and borrowers are the parties responsible for deciding to fund a real estate loan, not mortgage brokers. (ECF No. 376-1 at 73-75, 100; ECF No. 376-2 at 1-6, 13-19, 33-63; ECF No. 376-4 at 1-5, 11-45, 55-80, 82-91; ECF No. 376-5 at 8-20, 29-41; ECF No. 376-6 at 1-96.) This evidentiary-based claim is closely related to Whoolery's contentions that Counsel was ineffective for failing to present legal challenges related to the government's alleged failure to obtain or disclose "complete loan files" and establish the materiality element of the charged wire fraud conspiracy. The same analysis, in large part, applies. See supra Sections IV.A.1.a.ii. and iii.

Here, however, Whoolery contends that Counsel was ineffective for failing to subpoena the "complete loan files" directly from the lenders and closing companies, and to present related testimonial evidence at trial to establish lender and borrower responsibility, and, in turn, Whoolery's good faith defense.[12] As the court previously explained, however, proof of lender and borrower responsibility would not have exonerated Whoolery. See supra Sections IV.A.1.a.ii. and iii.

---

[12] The other part of Whoolery's good faith defense is his purported lack of knowledge about the fraud being committed at First Capital. See supra Section IV.A.1.c.iv.

Whoolery was charged with wire fraud conspiracy. The government's burden at trial was to prove that Whoolery agreed with another person to submit loan applications to lenders that contained false information about the fair market value of property, the licensure status of the individual signing the appraisal, or the financial condition of the borrower. The materiality of this information was judged based upon a reasonable person standard. Neder, 527 U.S. at 16. Although the government had no duty to establish actual reliance or causation in order to secure a conviction, the government presented the testimony of various lender representatives who spoke about the importance of knowing the relationship between the value of the collateral and the amount of the loan, the creditworthiness of the borrower, and the reliability of the appraised value in deciding whether to fund a loan. (ECF No. 207 at 123-31; ECF No. 209 at 91-97; ECF No. 211 at 54-62; ECF No. 212 at 17-24.) The government did not have to prove that First Capital's fees were excessive or not disclosed prior to closing in order to secure a conviction. In this context, this court cannot characterize Counsel's performance as ineffective because he failed to investigate and present evidence purportedly establishing lender or borrower responsibility to the jury. It is likewise impossible for Whoolery to establish a reasonable probability that the verdict in his case would have been different if Counsel had presented this kind of evidence to the jury. With this broad framework in mind, the court will now consider the evidence that Whoolery contends Counsel should have presented to the jury.

Whoolery identifies several witnesses, or kinds of witnesses, and documents that Counsel should have presented to the jury to establish that the lenders were responsible for a) confirming that First Capital's fees complied with applicable law, b) ensuring that the appraisal was correct, and c) deciding whether to fund a loan, and to demonstrate that lenders did not actually rely upon the information submitted by First Capital in the loan application. This evidence includes, among other things: the testimony of Donald Bartolomucci, "underwriters," representatives from Cardinal Financial, and expert witnesses in the fields of appraising, mortgage brokering, and underwriting, as well as underwriting findings and decision forms, FNMA guidelines, brokerage contracts, loan program or registration forms, and the U.S. Attorney Bulletin.[13]

Whoolery identifies several kinds of evidence that Counsel should have presented to the jury to establish that the borrowers were aware of and agreed to pay First Capital's fees, financially benefitted from the loans brokered by First Capital, and made the ultimate decision about whether to close a loan. This evidence includes, among other things: truth in lending forms, good faith estimate forms, and the testimony of "settlement agents."

The court considers Whoolery's arguments about this omitted evidence of lender and borrower responsibility below.

---

[13] The court previously addressed the relevancy of the U.S. Attorney Bulletin in note 2.

(a) **<u>Testimony of Donald Bartolomucci</u>:** Whoolery posits that

Counsel was ineffective because he did not offer the testimony of

Donald Bartolomucci ("Bartolomucci"), who was regional

manager for Gateway Lending ("Gateway") in Pittsburgh,

Pennsylvania until 2004. According to Whoolery, based upon a

summary of a witness interview attached to Whoolery's § 2255

motion, Bartolomucci would have established that Immekus was

in control of the First Capital office, not Whoolery, and that

Gateway never had problems with any loans brokered by First

Capital. Whoolery submits no declaration or affidavit from

Bartolomucci indicating what the substance of his testimony

would have been had he been called to testify at trial.

Counsel's decision not to call Bartolomucci cannot be

characterized as objectively unreasonable. Counsel did call

David Shallcross ("Shallcross"), who replaced Bartolomucci

when Bartolomucci left Gateway in 2004. (ECF No. 213 at 3.)

Shallcross held Bartolomucci's position from 2004 until 2006,

which covers the majority of the time period of the charged

conspiracy. Shallcross testified about Immekus' control, and

Whoolery's lack of control, over the First Capital offices. (ECF

No. 213 at 6-7.) Bartolomucci's testimony would have been

cumulative in these circumstances. Failure to offer cumulative evidence cannot be characterized as objectively unreasonable, and, even if it could be, it could not have affected the jury's verdict.

Although Shallcross did not testify specifically that he never had problems with the loans brokered by First Capital, like Bartolomucci allegedly would have, there also was no testimony, even on cross-examination, indicating that Shallcross knew First Capital loans to be fraudulent or problematic. In any event, the jury need not have found that Gateway discovered that any loan brokered by First Capital was fraudulent, or "had problems," or caused an actual financial loss in order to convict Whoolery of the charged wire fraud conspiracy. Iannelli, 420 U.S. at 777 ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."); Moleski, 2016 WL 231537, at *2 (citing Neder, 527 U.S. at 16). Bartolomucci's testimony about his personal satisfaction with First Capital's work would have been irrelevant to determining whether Whoolery agreed to commit wire fraud with another person. Counsel cannot have acted unreasonably in failing to secure the admission of irrelevant evidence. Even if Counsel should have

secured the admission of this evidence, there is no reasonable probability that the lack of such evidence affected the jury's verdict.  Whoolery, therefore, could not have been prejudiced by Counsel's failure to call Bartolomucci.

**(b) <u>Underwriting Evidence</u>:**  Whoolery contends that had Counsel submitted evidence to the jury about the underwriting process he would not have been convicted.  According to Whoolery, with this evidence, the jury would have understood that lenders are ultimately responsible for deciding whether or not to fund a loan brokered by First Capital, after considering risk factors identified during the underwriting process.  Whoolery posits that this evidence would have additionally established that the lenders did not actually rely upon the statements made in First Capital's loan applications about the value of a property or the financial condition of a borrower when deciding whether to fund a particular loan and that lenders were the party responsible for the accuracy of a real estate appraisal.

As an initial matter, Whoolery's theory is directly contradicted by the record.  The lender witnesses consistently explained to the jury why the fair market value of a property offered as collateral for a loan and the borrower's financial

circumstances are important to a funding decision. (ECF No. 207 at 123-31, 134-51; ECF No. 209 at 91-97, 99-107; ECF No. 211 at 54-73; ECF No. 212 at 17-24, 24-34.)  Whoolery's attempts to prove otherwise fail in the face of this evidence, and defy logic. Notably, Whoolery does not identify a single witness or document attesting to the fact that the value of collateral and the financial condition of the borrower would not be relevant to a reasonable person making a funding decision.

One category of evidence that Whoolery faults Counsel for failing to introduce at trial is the testimony of representatives from Cardinal Financial Company ("Cardinal").  Whoolery attaches excerpts from depositions taken of certain Cardinal representatives during a civil lawsuit in which Cardinal accused First Capital of causing it financial losses by submitting loan applications that contained fraudulently inflated real estate appraisal values.  Whoolery contends that Counsel was unconstitutionally ineffective because he did not call these deponents to testify on his behalf during his criminal trial, as either fact or expert witnesses. (ECF No. 354-15 through -20, -116.)

It is difficult to characterize Counsel's decision not to call these witnesses as objectively unreasonable. Whatever favorable facts Whoolery believes that these witnesses could have established about how lenders decide to fund loans and their responsibility to ensure that mortgage brokers are acting in accordance with the law, their cross-examination by the government would likely have been hostile and damaging to Whoolery. Cardinal sued First Capital for engaging in the exact same misconduct that the government accused Whoolery of committing in this case. Although First Capital's counsel developed valid defenses in that civil case based upon actual reliance and contributory fault, these defenses would not have exonerated Whoolery in this criminal case. <u>Moleski</u>, 2016 WL 231537, at *2 (citing <u>Neder</u>, 527 U.S. at 25, <u>Coffman</u>, 94 F.3d at 333, and <u>Coyle</u>, 63 F.3d at 1244); <u>see</u> <u>supra</u> Sections IV.A.1.a.ii. and iii.

The court is constrained to find that Counsel's decision not to expose Cardinal's representatives to cross-examination by the government was objectively unreasonable under the circumstances, and can only conceive of negative ways that the testimony would have affected Whoolery's criminal trial if

Counsel had sought its admission. Whoolery cannot establish a reasonable probability that he would have been acquitted if Counsel secured the testimony at trial of the Cardinal Financial representatives.

In addition to the testimony of the Cardinal representatives, Whoolery contends that Counsel should have called unidentified "underwriters," and unidentified expert witnesses in mortgage brokering and underwriting to testify, and should have obtained and admitted automated underwriting findings, underwriting decision forms, the FNMA guidelines, brokerage contracts, and loan program/registration forms. As an initial matter, Whoolery's claims about the testimony that should have been secured from unidentified "underwriters" and experts can be assigned no weight. The court cannot determine who these individuals are or what they would have said at trial based upon Whoolery's submissions. Whoolery's assertions about how these witnesses would have secured his acquittal are pure speculation. The court, however, puts this critical deficiency aside.

As explained several times in this opinion, lender responsibility is legally irrelevant. The government was not required to prove actual reliance on First Capital's fraudulent

information in order to establish Whoolery's participation in the charged wire fraud conspiracy. <u>Moleski</u>, 2016 WL 231537, at *2 (citing <u>Neder</u>, 527 U.S. at 16).  Although a lender's responsibility for ensuring that a loan file is accurate and proper, and deciding whether to fund a loan based upon the various risk factors identified during the underwriting process may be a valid defense in a civil lawsuit, it does not absolve Whoolery of criminal liability for participating in the First Capital wire fraud conspiracy.  The "underwriting evidence," therefore, was not relevant to any defense in this case and Counsel was objectively reasonable in declining to introduce it to the jury.

Even if Counsel acted unreasonably in failing to present this underwriting evidence to the jury, Whoolery could not establish that he would have been acquitted had the evidence been admitted.  Lender responsibility for funding decisions and for ensuring that appraisals were reliable, could not have altered the jury's verdict because, as explained above, even if true, these facts do not absolve Whoolery of criminal responsibility for participating in the wire fraud conspiracy.  Whoolery cannot escape criminal liability for falsifying income or asset documents or submitting fraudulently inflated appraisals even if the lenders

acted irresponsibly or unreasonably in failing to recognize the fraud in First Capital's loan submissions or in deciding to fund loans that were identified during the underwriting process as risky or undesirable. <u>Moleski</u>, 2016 WL 231537, at *2 (citing <u>Coyle</u>, 63 F.3d at 1244). Likewise, Whoolery cannot escape criminal liability even if the lenders did not actually rely upon the false information in First Capital's loan applications. <u>Id.</u> (citing <u>Neder</u>, 527 U.S. at 25, and <u>Coffman</u>, 94 F.3d at 333). Contrary to Whoolery's fundamental contention, the lenders' errors are not probative of Whoolery's innocence.

In any event, Whoolery pursued these theories through the cross-examination of the lender representatives who testified on behalf of the government. (ECF No. 207 at 134-51; ECF No. 209 at 99-107; ECF No. 211 at 62-73; ECF No. 212 at 24-34.) Calling additional witnesses to testify in support of legally inconsequential arguments could not have affected the outcome of the case and caused Whoolery any prejudice.

**(c) <u>Settlement Evidence</u>:** Whoolery contends that if Counsel had submitted evidence to the jury about the loan settlement or closing process he would have been acquitted. According to Whoolery, Counsel was ineffective because he did not a) call the

settlement agents present at the closing of each loan about which the borrower-witnesses testified at trial and b) obtain complete loan files for each loan, which would have included truth in lending statements, good faith estimates, and settlement documents, among other items.  This evidence, Whoolery explains, would have "dispel[led] the testimony of the borrowers that they were unaware of being charged exorbitant brokers fees and yield spread premiums" and "counteract[ed] these lies." (ECF No. 376-2 at 2-3.)  Whoolery contends that this evidence would have established that the lenders were responsible for certifying that First Capital's fees complied with state and federal law.  These arguments are facially without merit and entitle Whoolery to no relief for a purported violation of his constitutional rights.

One category of evidence that Whoolery faults Counsel for failing to introduce at trial is the testimony of unidentified "settlement agents."  This argument can be ascribed no weight because the court cannot determine who these individuals are or what they would have said at trial.  This argument is speculative. The court, however, puts this critical deficiency aside and evaluates Whoolery's contention that Counsel violated his

constitutional rights by failing to offer evidence about the loan settlement process at trial.

As explained several times in this opinion, a borrower's knowledge and consent to First Capital's fees, and the lenders' so-called approval of the fees are legally irrelevant. The government was not required to prove that First Capital's fees were excessive or not disclosed in order to establish that Whoolery participated in the charged wire fraud conspiracy. <u>See</u> <u>supra</u> Sections IV.A.1.a.ii. and iii. Evidence about the size of the fees charged by First Capital established Whoolery's motive for entering the charged wire fraud conspiracy, and intent to defraud: by falsifying appraisal and financial information on loan applications more loans would be funded and First Capital would earn more fees, 50% of which were paid to Whoolery even if he had no personal involvement in the loan. Under these circumstances, even if Counsel established that the borrowers were made aware of the fees being charged by First Capital and had a complete understanding of the yield spread premium, and that the lenders did not classify First Capital's fees as excessive, it would not follow that Whoolery would have been acquitted.

The unidentified settlement agents could have provided some testimony, assuming that they had a specific recollection of a particular loan's closing, about the borrowers' awareness of the fees charged by First Capital at closing, by attesting to the fact that the fees were reflected on the closing documents, such as the truth in lending statements and good faith estimates, and that the borrowers signed those closing documents. Counsel, however, established this point repeatedly by confronting the testifying borrowers with their closing documents and pointing out that the fees were listed on them, and that the borrowers signed them. (e.g., ECF No. 207 at 163, 168-69; ECF No. 209 at 99-100, 103-05; ECF No. 211 at 66-72; ECF No. 213 at 123-26, 128-29, 139, 141, 146-47.) Further proof of this largely undisputed fact, through the testimony of a dozen settlement agents, would have had minimal, if any, relevance. Even if the settlement agent assigned to each loan testified that every borrower had a complete understanding of all First Capital fees, including the yield spread premium, Whoolery would not have been absolved of criminal liability for his participation in the Whoolery-First Capital wire fraud conspiracy, which consisted of an agreement to submit false information to lenders about the value of collateral and the

financial condition of borrowers.  Under these circumstances, Counsel's decision not to call the unidentified "settlement agents," or to obtain and secure the admission of settlement-related documents cannot be characterized as objectively unreasonable or prejudicial.

For the same reasons, even if Counsel was unreasonable in failing to present this evidence to the jury, Whoolery could not establish that he would have been acquitted had the evidence been admitted.  A borrower's knowledge about the fees could not have altered the jury's verdict because, as explained above, even if true, these facts do not absolve Whoolery of his participation in the wire fraud conspiracy.  Whoolery cannot escape criminal liability for falsifying income or asset documents or submitting fraudulently inflated appraisals on the basis that the borrowers were aware of the fees they were being charged and the lenders did not identify the fees as excessive.  Whoolery can establish no reasonable probability that he would have been acquitted even if Counsel had proven the testifying borrowers to be "unreliable" "liars" with respect to their awareness and understanding of the fees being charged by First Capital.

In any event, Whoolery pursued these lines of inquiry through
the cross-examination of the borrowers who testified at trial on
behalf of the government. (e.g., ECF No. 207 at 163, 168-69; ECF
No. 209 at 99-100, 103-05; ECF No. 211 at 66-72; ECF No. 213 at
123-26, 128-29, 139, 141, 146-47.) Calling additional witnesses to
testify in support of these same arguments would have been
cumulative and could not have affected the outcome of the case,
given the lack of relevancy of this evidence under the applicable
law.

### (iii)     Evidence Establishing Validity of Apprentice Appraisers and Drive-by Appraisals

Whoolery contends that Counsel did not provide him the representation guaranteed
by the Sixth Amendment because he failed to obtain and submit evidence to the jury
establishing that apprentice appraisers and drive-by appraisals are permissible practices in
the industry. In particular, Whoolery faults Counsel for not introducing the FNMA
Appraisal Guidelines and loan program requirements, and for not securing the testimony of
an expert in the field of real estate appraising. According to Whoolery, this evidence
would have established that the appraisals characterized by the government as fraudulent
were, instead, valid. None of this evidence was relevant to the issues before the jury in
Whoolery's criminal trial. Counsel, therefore, cannot be characterized as objectively
unreasonable for failing to investigate and present this evidence.

**(a) Apprentice Appraisers:** The evidence at trial did not establish an apprentice relationship between any of the licensed appraisers and Cowden or Baldwin. The evidence at trial contradicted the notion that Baldwin worked under the authority and tutelage of Gray or Sheraw as an apprentice, or that Cowden was an apprentice to the licensed appraisers whose names he used to submit appraisals. (ECF No. 207 at 178-81; ECF No. 209 at 154-56, 162-66.) The evidence, instead, established that Whoolery paid licensed appraisers for permission to allow Baldwin to use their credentials in order to create fraudulently inflated appraisals of properties, or allowed Cowden to use the licensing credentials of third parties. (ECF No. 209 at 153-63.) Whoolery proffers no evidence with his § 2255 motion that would establish, contrary to the trial record, that Baldwin and Cowden were acting as apprentice appraisers when they prepared fraudulent appraisals for First Capital.

The propriety of apprentice appraisers, therefore, was irrelevant. Counsel could not have violated Whoolery's constitutional rights by failing to present irrelevant

evidence to the jury.  In addition to being irrelevant, evidence about apprentice appraisers would not have been exculpatory to Whoolery.  For instance, Whoolery faults Counsel for failing to secure the admission of the FNMA Guidelines (the "Guidelines"). (ECF No. 354-5.)  The Guidelines recognize that licensed appraisers can use employees or sub-contractors, i.e., apprentices, to perform appraisal-related tasks for the licensed appraiser.  The licensed appraiser, however, must acknowledge the extent of the apprentice's assistance and the tasks performed by that individual, and must be the one to sign the report. (Id. at 5-6.)  Supervisory and review appraisals are also permitted by the Guidelines, but, again, the licensed appraiser must either sign the appraisal and attest to the fact that he or she supervises the apprentice, or must attach a separate "review report." (Id. at 6-7.)

The Guidelines in no way sanction the practice of allowing an unlicensed individual to use an appraiser's licensing credentials, without any further involvement by the licensed appraiser, or using an individual's licensing credentials without permission, which is what the

94

evidence establishes occurred at First Capital. (ECF No. 207 at 178, 181; ECF No. 209 at 154-56, 162-66.) Whoolery proffers no evidence establishing, contrary to this trial record, that Baldwin or Cowden were acting within the parameters of the Guidelines as apprentice appraisers. Rather than legitimizing First Capital's practices, admission of the Guidelines would have provided further evidence establishing the impropriety of Baldwin's and Cowden's actions. Counsel's failure to present evidence that would have further implicated Whoolery in the charged crime cannot be characterized as objectively unreasonable. Counsel's strategic decision, apparently in the face of Whoolery's insistence to the contrary at trial, to avoid making the jury aware of the Guidelines was sound and justified. Had the Guidelines been admitted into evidence, the jury would have only obtained further proof that First Capital's appraisal practices were improper.

Even if Counsel was unreasonable in failing to present this evidence to the jury, Whoolery could not establish that he would have been acquitted had the evidence been

admitted.  As just discussed, contrary to Whoolery's belief, evidence about the propriety of using apprentice appraisers was not exculpatory.  The record at trial does not establish that the unlicensed individuals preparing appraisals for First Capital were apprentices who operated under the supervision or tutelage of licensed appraisers.  Whoolery proffers no evidence to establish those facts with his § 2555 motion.  Therefore, information about apprentice appraisers would have been of no benefit to Whoolery's defense, and Counsel's failure to submit such evidence could have had no effect on the verdict.  Whoolery can show no reasonable probability that he would have been acquitted if Counsel presented evidence about the propriety of apprentice appraisers to the jury.

(b) **Drive-By Appraisals:**  Counsel likewise was not ineffective for failing to establish that drive-by appraisals are permissible for some loan programs.  The government did not contend that Whoolery engaged in a wire fraud conspiracy because he conducted, or allowed Baldwin or other coconspirators to conduct, so-called drive-by appraisals when they should have conducted another kind

96

of appraisal. What the government contended was that First Capital submitted appraisals in which unlicensed individuals, posing as licensed appraisers, represented that they viewed the exterior, and sometimes the interior, of a home even though all the individual did was look at pictures that a salesman took of the home, and sometimes alter those pictures to increase the visual appeal, and value, of the property. (ECF No. 209 at 155, 163.)

The fact that certain lenders or loan programs would accept drive-by appraisals is irrelevant to the methods of operation of the Whoolery-First Capital conspiracy. Counsel could not have acted unreasonably by failing to offer irrelevant evidence. In any event, Counsel established the propriety of drive-by appraisals as a general matter during cross-examination of the government's witnesses. (ECF No. 207 at 148-49; ECF No. 209 at 88, 106-07; ECF No. 211 at 50-53, 69; ECF No. 212 at 14-16, 32.) This fact, however, does not exonerate Whoolery because no evidence offered either at trial or in connection with Whoolery's § 2255 motion establishes that drive-by appraisals were permitted on the

loans First Capital was brokering, or that First Capital disclosed to lenders that it only performed a drive-by appraisal of a property. The record, instead, establishes that the lenders would not have accepted drive-by appraisals from First Capital, and that First Capital was representing to the lenders that a licensed appraiser was conducting complete, on-site, appraisals when, in fact, no appraiser was visiting the properties at all. (ECF No. 207 at 148-49; ECF No. 209 at 88, 106-07; ECF No. 211 at 50-53, 69; ECF No. 212 at 14-16, 32.) The propriety of drive-by appraisals under these circumstances was irrelevant.

Counsel, therefore, did not act unreasonably by failing to submit evidence to the jury about drive-by appraisals. Like the apprentice appraisal evidence, the evidence would only have further illustrated to the jury that what First Capital was doing, i.e., stating that a licensed appraiser visited the property when, in fact, no licensed appraiser had done so, was improper.

For these same reasons, even if Counsel's representation had been deficient in this regard, Whoolery

cannot establish prejudice as a result of Counsel's failure
to obtain and admit evidence about drive-by appraisals.
Whoolery can show no reasonable probability that he
would have been acquitted if Counsel had submitted more
evidence about the propriety of drive-by appraisals.

### (iv)  Evidence Establishing Whoolery's Lack of Knowledge or Tolerance

Whoolery contends that Counsel was unconstitutionally inefficient because he
failed to obtain and admit a variety of evidence identified by Whoolery, which he
contends would have "negate[d] the element of 'intent to defraud'" by proving that he
was unaware of and refused to tolerate fraud at First Capital.  According to Whoolery, the
evidence identified below would establish that a) Whoolery was often out of the office
between 2003 and 2006, b) Whoolery's mother, Immekus, was responsible for running
the office in his absence (and by implication, directed any fraud that took place during
that time), c) Whoolery fired Immekus when he learned that she was committing fraud,
and d) Whoolery fired other employees, such as Daniel Gillen and John Polosky, when he
learned that they were committing fraud.  It bears noting at the outset that Whoolery's
mother, Immekus, died in 2008 prior to Whoolery's trial.  She could not then and cannot
now contradict Whoolery's assertions, sometimes implicit and sometimes explicit, that
she was the individual who masterminded the mortgage fraud conspiracy at First Capital.

The court will examine each piece of evidence below.  None of this evidence,
either alone or in combination, however, would have established Whoolery's lack of

knowledge, good faith, or innocence. Counsel's failure to procure or offer the evidence, therefore, cannot have been objectively unreasonable. Even if it was, the result of Whoolery's trial would not have changed if the evidence had been submitted to the jury, making it impossible for Whoolery to make the required showing of prejudice.

    **(a)** <u>**Matt Malagese**</u>**:** According to Whoolery, Counsel intended to call Malagese, but decided not to because Counsel became concerned about the witness's credibility. Citing to a letter written by Malagese in support of Whoolery at his sentencing and a written summary of a witness interview, Whoolery contends that Malagese would have contradicted various First Capital witnesses who claimed that Whoolery trained new employees and decided who conducted appraisals. (ECF No. 376 at 76, 82; ECF No. 354-42 and -59.) Whoolery further explains that Malagese would have testified, among other favorable things, that Whoolery required all employees to follow the rules and fired one employee, Daniel Gillen, because he was caught creating false documents. Whoolery does not provide a declaration from Malagese indicating that he would have testified at trial, or what the content of his testimony would have been.

In assessing whether it was objectively reasonable for Counsel to decide not to call Malagese, an examination of the interview summary offered by Whoolery reveals important facts. That summary includes statements that Whoolery was "a very volatile guy" and summarizes an altercation at Malagese's house that caused Whoolery's wife to hide in a closet of Malagese's home and led Malagese to kick Whoolery out of his house and to stop speaking to him. (ECF No. 354-59.)

As an initial matter, contrary to Whoolery's assertions, Malagese would not have told the jury that Whoolery was never in the office. Malagese's interview summary reflects that he stated instead that Whoolery was never in the office more than three days a week. This testimony would not have established, and would have contradicted, Whoolery's theory that he could not have known about any fraud that was taking place there because he was never in the First Capital offices. Given that the government established that the fraud at First Capital was overt and ubiquitous, presence in the office 2 or 3 days a

101

week would not be probative of Whoolery's lack of knowledge.

Malagese would have also corroborated Baldwin's timeline by explaining that before he came to work for First Capital in 2002, Whoolery had started his own company that operated out of Whoolery's house. Based upon these facts, Counsel's strategic decision not to call Malagese to the stand cannot be characterized as objectively unreasonable.

Even if Counsel's decision was objectively unreasonable, Whoolery cannot establish prejudice. Malagese left First Capital in 2004, two years before the charged conspiracy ended, and could have provided no defense to or contradiction of the evidence establishing Whoolery's participation in the wire fraud conspiracy after that date. Moreover, there is no indication that Malagese was privy to meetings between or decisions involving Baldwin, Cowden, or Gray. He could not refute the evidence establishing Whoolery's agreements with these individuals, or their testimony.

In summary, Malagese's testimony that he knew Whoolery, between 2002 and 2004, to operate legitimately and not to tolerate misconduct would not have contradicted the overwhelming testimonial and documentary evidence that established the existence and operation of the Whoolery-First Capital conspiracy, either alone or in combination with any other evidence that Whoolery contends that Counsel should have brought to bear. Whoolery, therefore, can show no reasonable probability that he would have been acquitted if Counsel had called Malagese to testify at trial.

**(b)** **<u>Randy Engle</u>:** Whoolery contends that Counsel was unconstitutionally ineffective because he did not call Randy Engle ("Engle"), an individual for whom Whoolery secured loans for the purchase and refinance of commercial properties between 2005 and 2008, to testify at trial. According to Whoolery, based upon a letter that Engle wrote in Whoolery's support prior to his sentencing, Engle would have testified that John Polosky stole money from him (Engle) and Whoolery helped recover it, going so far as to involve the attorney general's office, proving

that Whoolery was an honest man and unlikely to be involved in a wire fraud conspiracy. (ECF No. 354-41.) Whoolery does not attach a declaration from Engle stating that he would have testified on Whoolery's behalf at trial or what the content of his testimony would have been.

The relevancy of Engle's testimony is questionable. First, the transaction about which Engle complains involved commercial loans, which were not alleged to be part of the wire fraud conspiracy charged in this case. Second, the incident about which Engle would have testified apparently occurred around the time that Polosky was allegedly fired by Whoolery, in October 2007. (ECF No. 354-41; ECF No. 212 at 54.) The charged conspiracy, however, ended in November 2006. Third, Engle does not have first-hand knowledge about why Whoolery fired Polosky; his letter states that he was told by Whoolery that Polosky was fired because he was "scamming clients." (ECF No. 354-41.) Engle would not be able to testify about Whoolery's statement for its truth at trial. FED. R. EVID. 801; Console, 13 F.3d at 656; Bailey, 2016 WL 3382007, at *1. Based upon all these facts, Engle's

testimony would have been of limited relevance, even if Counsel secured its admission. Counsel's decision not to call him to the stand cannot be characterized as objectively unreasonable under the circumstances.

Even if Counsel's decision was objectively unreasonable, Whoolery cannot establish prejudice. Engle's testimony would have established only that sometime after October 2007, which was after the charged conspiracy ended, Whoolery helped him recover money stolen by Polosky in connection with a commercial loan transaction, and that he was told that Polosky had been fired from First Capital for "scamming clients." This evidence, either alone or in combination with any other evidence that Whoolery contends that Counsel should have brought to bear, does not contradict the overwhelming testimonial and documentary evidence that established the existence and operation of the Whoolery-First Capital conspiracy. There is no reasonable probability that Counsel's failure to call Engle resulted in his conviction.

**(c) Barry Baldwin:** Whoolery next contends that Counsel was ineffective because he failed to call Barry Baldwin, husband of coconspirator Kim Baldwin, to testify on his behalf. According to Whoolery, Barry Baldwin would have either told the truth about a confrontation that Whoolery and he had in the fall of 2004, or would have lied, thus laying the foundation for Whoolery to call his father, Lewis Whoolery, Sr., to contradict Barry Baldwin's version of that event.

Whoolery submits several documents allegedly prepared and signed by his father which indicate that his father would have testified that Whoolery informed Barry Baldwin during the fall 2004 confrontation that Kim Baldwin and Immekus, who was their mother and also Whoolery Sr.'s ex-wife, were involved in a fraudulent appraisal scheme with Gray and that Whoolery told Barry Baldwin to put a stop to it. (ECF No. 354-9 to -11.) This, Whoolery contends, proves that Whoolery was not a member of the wire fraud conspiracy at First Capital, and that Kim Baldwin and Immekus were committing fraud without his approval.

It is difficult to characterize Counsel's decision not to call Barry Baldwin, husband of Kim Baldwin, who was a cooperating coconspirator, as objectively unreasonable. Whoolery identifies no basis for this court to find that Barry Baldwin would have testified in Whoolery's favor, and against the interests of his wife, Kim Baldwin. Whoolery contends, however, that Counsel should have called Barry Baldwin so that Whoolery, Sr. could have refuted Barry Baldwin's expected lies about the incident in the fall of 2004.[14]

Although Whoolery, Sr. would be qualified to testify about what he observed of that incident, any testimony about what Barry Baldwin or Whoolery said during the altercation would be inadmissible hearsay. FED. R. EVID. 801; Console, 13 F.3d at 656; Bailey, 2016 WL 3382007, at *1. Whoolery fails to articulate any reason why such testimony would be admissible for any reason other than

---

[14] Whoolery also contends that Barry Baldwin and Whoolery, Sr., if called to impeach Barry Baldwin, would have established that Whoolery fired Immekus and that Immekus had "control" over Kim Baldwin. There is no indication in the evidence Whoolery proffers with his § 2255 motion that either Barry Baldwin or Whoolery, Sr. had first-hand knowledge of these facts. These arguments are convoluted, and in any event, do not constitute evidence probative of Whoolery's innocence.

to impeach Barry Baldwin. Even if such testimony was admissible under some exception to the hearsay rule, the declarations and letters drafted by Whoolery, Sr. and submitted by Whoolery with his § 2255 motion do not include a recitation of all the statements that Whoolery claims in his briefing were made during that confrontation. Whoolery, Sr. states only that he overheard Whoolery inform Barry Baldwin that his wife (Kim Baldwin) and Whoolery's mother (Immekus) were involved in "some illegal dealings in Philadelphia" and Whoolery wanted it to stop, to which Barry Baldwin responded "mind your own business" and refused to engage in further conversation. (ECF No. 354-10 to -11.) These statements, even assuming for the sake of argument that they were substantively admissible, do not exonerate Whoolery of the charged wire fraud conspiracy. In fact, given that the record establishes that Kim Baldwin prepared appraisals on behalf of First Capital after 2004, these statements would have established that Whoolery continued to use Kim Baldwin's services even after he became aware that she was engaged in fraud. Such

evidence would have further implicated Whoolery in the charged wire fraud conspiracy, not exonerated him.

Moreover, Whoolery's complaint about "illegal dealings" is specifically tied to business in Philadelphia, not Pittsburgh, where First Capital is located. The evidence at trial established that Whoolery and Kim Baldwin engaged in fraud for years in the Pittsburgh area before expanding their business to Philadelphia and Florida. Whoolery's statement in this context is vague, and does not disprove or contradict the other evidence admitted at trial establishing that Whoolery and Kim Baldwin were involved in a mortgage fraud conspiracy in Pittsburgh, through First Capital. The declarations and letters submitted by Whoolery, Sr. do not include any information, first-hand or otherwise, about Whoolery's motivation for confronting Barry Baldwin, or ordering Barry Baldwin to put a stop to Kim Baldwin's conduct in Philadelphia. The confrontation is not evidence that Kim Baldwin was engaged in a mortgage fraud conspiracy at First Capital without Whoolery's knowledge or consent. Counsel's failure to call Barry Baldwin in order to set the

stage for the admission of Whoolery, Sr.'s testimony about this fall 2004 confrontation was not objectively unreasonable.

Even if Counsel acted unreasonably in failing to call Barry Baldwin, there is no reasonable probability that Counsel's failure to do so resulted in Whoolery's conviction. There was overwhelming testimonial and evidentiary evidence of Whoolery's participation in the charged wire fraud conspiracy. Whoolery Sr.'s impeachment of Barry Baldwin about the fall 2004 incident would not have contradicted any of this evidence, and even if Whoolery, Sr.'s statements were admissible for their truth, they would not disprove the existence of the Whoolery-First Capital conspiracy.[15]

(d) **<u>Jeff Smith</u>:** Whoolery contends that Counsel was ineffective because he failed to secure the allegedly exculpatory testimony of Jeff Smith ("Smith"), who was

---

[15] Any claims made by Whoolery, Sr. in the exhibits attached to Whoolery's motion to vacate that Kim Baldwin admitted to him after trial that she lied cannot support an ineffective assistance of counsel claim. This evidence was not available to Counsel at the time of trial, making it impossible for Counsel to have acted unreasonably by failing to secure its admission. In any event, this court and the court of appeals ruled that this purported "new evidence" did not warrant in a new trial in 2015. <u>Whoolery II</u>, 625 F.App'x at 26-27.

John Polosky's personal loan processor between June 2006 and the end of 2007. According to Whoolery, based upon an FBI interview summary, Smith would have testified that he (Smith) was not aware that anyone at First Capital had illicit "deals" with anyone else, and that he understood Baldwin to be an apprentice to Jason Sheraw and to be paid $500 per appraisal. (ECF No. 354-43.) Whoolery explains that Smith would have also testified that Whoolery was always "screaming and yelling and wired." (Id.) Whoolery does not attach a declaration from Smith stating that he would have testified on Whoolery's behalf at trial or what the content of his testimony would have been.

It was objectively reasonable for Counsel to not call Smith to testify. The FBI interview summary to which Whoolery refers contains a plethora of testimony that would have been adverse to Whoolery, and consistent with the government's theory of the case, including that Baldwin would use the names and licensure information of different individuals to prepare appraisals for Polosky, and that various tactics would be used, such as doctoring

photographs or inaccurately describing a property or its location, in order to inflate the appraised value of the property. (Id.)  Smith, in fact, told the FBI that Baldwin's appraisals were inflated "99% of the time." (Id.)  The government would have brought this adverse testimony out on cross-examination if Smith had been called to testify on Whoolery's behalf.

Against this backdrop of damaging evidence, the court cannot characterize Counsel's decision not to call Smith to testify about his lack of personal knowledge about the Whoolery-First Capital conspiracy and his understanding of the relationship between Baldwin and Sheraw as objectively unreasonable.

Even if Counsel acted unreasonably by failing to call Smith, Whoolery was not prejudiced by the error.  Smith's testimony would not have contradicted, or even called into question, the testimony of nearly a dozen of Whoolery's coconspirators who testified about the existence and operation of the Whoolery-First Capital conspiracy, or the documentary evidence that established the same. (ECF No. 394 at 34 n.2.)  Especially given that Smith would

have corroborated many of the conspiracy's methods of operation advanced by the government, such as doctoring photographs and inaccurately describing properties, Whoolery cannot show a reasonable probability that he would not have been convicted if Counsel secured the testimony of Smith at trial.

**(e) <u>Clifford Report and Testimony</u>:** Whoolery faults Counsel for failing to secure the testimony of Clifford, and the admission of his report in order to support Whoolery's good faith defense. The court previously discussed this report and witness in section IV.A.1.c.i(b). Here, Whoolery contends that Counsel should have used the report to establish that First Capital was in compliance with all banking laws and that even though the Pennsylvania Department of Banking conducted a special examination of First Capital's files in 2008, it made no adverse findings. The report also would purportedly have established that Immekus was in charge of the First Capital offices.

As discussed previously, assuming that Clifford's report would be admissible, and Clifford's testimony obtainable, the evidence would have been of little substantive value to Whoolery's defense. The report was completed in 2008, which is after the charged conspiracy ended, and refers to file reviews that were conducted in 2007 and 2008, which is also after the conspiracy ended. (ECF No. 354-51.) Whoolery offers no explanation about the scope or meaning of the file reviews referenced in Clifford's report. These reviews, therefore, could not have disproved that Whoolery participated in a criminal conspiracy at First Capital between 2003 and 2006.

In addition, much of Clifford's report supports the government's case. For instance, the report refers to a complaint made in 2006 about "possible mortgage and appraisal fraud." The report, although identifying Immekus as the office manager, lists Whoolery as the President and CEO of First Capital. Counsel cannot be said to have acted objectively unreasonable in failing to call Clifford to testify about his report under the totality of the circumstances.

Even if Counsel did act unreasonably, Whoolery cannot show a reasonable probability that he would not have been convicted if Counsel had secured the admission of Clifford's report and testimony. The Clifford report was not probative that Whoolery was innocent of the charged crime, and, instead, contained evidence that would have been adverse to Whoolery, e.g., that a complaint about mortgage fraud had been made and that Whoolery was the President and CEO of the company.

**(f)** <u>**Purchase of Desktop Underwriting Program**</u>:

Whoolery contends that Counsel violated his constitutional rights by failing to bring forth evidence that he purchased computerized desktop underwriting findings for each loan brokered by First Capital, as an internal quality control mechanism. This, and related expert testimony, Whoolery contends, would have proved that Whoolery had no knowledge of fraud at First Capital, arguing "Why would Whoolery <u>voluntarily pay</u> for a service that provided up to thirty-seven (37) different alerts to the banks on possible issues with loan files, if he was trying to defraud the banks?" (ECF No. 376-6 at 59.)

Whoolery's theory, however, fails to recognize that this computer program relied upon the information put into the system from the loan applications prepared by First Capital regarding, for example, the value of the property and the financial condition of the borrower. The government proved at trial that these input items were falsified by First Capital. The output from the system was, therefore, infected. The fact that Whoolery purchased this program is therefore not probative of Whoolery's purported innocence.

Regardless, Whoolery proffers no evidence to support his theory that purchase of the desktop underwriting system is probative of his good faith. Whoolery's brief relies upon his personal opinion, logic, and speculation that a jury would have considered the system to be evidence of his good faith and lack of knowledge of the fraud occurring at First Capital. A jury could just as easily have considered Whoolery to have used the system as a decoy. Whoolery's personal opinion about what the jury would have thought about certain evidence is insufficient to support an ineffective assistance of counsel

claim. Whoolery made no showing of either deficient performance or prejudice in connection with this alleged error.

(g) **<u>Check to Gray for $4,000</u>:**  In one of Whoolery's most perplexing arguments, he claims that Counsel was unconstitutionally ineffective because he failed to proffer unidentified evidence to the jury to explain that a $4,000 check he wrote to Gray was not compensation for Baldwin's use of Gray's licensing credentials, but was instead prepayment for ten legitimate appraisals, at $400 each. (ECF No. 376-6 at 89.)  Although Whoolery recounts his version of the facts supporting this theory in his brief, he identifies no piece or category of evidence that Counsel should have, or could have, offered to prove his theory at trial.  Whoolery never indicates that he would have waived his Fifth Amendment right and testified at trial about this matter.  Notably, both Gray and Baldwin testified that Whoolery paid Gray to compensate her for allowing Baldwin to use her licensure credentials, and that Gray never actually performed appraisal work for First

Capital, all of which directly contradicts Whoolery's theory.

It is impossible to characterize Counsel's representation as objectively unreasonable when Whoolery does not indicate how Counsel could have established this allegedly exculpatory fact about one of the checks that Whoolery wrote to Gray.

Even if Counsel was deficient in this regard, Whoolery makes no showing that the result of his trial would have been different if Counsel presented evidence about this theory to the jury. Overwhelming evidence established that Whoolery participated in the charged wire fraud scheme, including by purchasing the licensing credentials of Gray for Baldwin's use. Even if Counsel had established, using evidence that Whoolery does not identify, that Whoolery wrote one check to Gray to reimburse her for legitimate appraisals, that fact would not contradict or disprove the other evidence establishing that Whoolery paid Gray to allow Baldwin to use her licensing credentials.

**(h) Evidence that Whoolery Terminated Employees:**

Whoolery contends that Counsel was unconstitutionally
ineffective because he failed to obtain or properly present
evidence that Whoolery objected or terminated employees
if he discovered that they were engaged in misconduct. A
review of the trial record, however, reveals that Counsel
did in fact present this kind of evidence during the cross-
examination of several government witnesses. (ECF No.
207 at 108-69, 114; ECF No. 208 at 26, 90-91; ECF No.
209 at 75-76; ECF No. 210 at 191-92; ECF No. 211 at 2,
16-17; ECF No. 212 at 99-100.) Counsel, in fact, relied
upon this evidence in his closing argument. (ECF No. 213
at 143.)

Whoolery's personal belief that the evidence should
have been presented in a different manner, or emphasized
in a different way does not render Counsel's
representation objectively unreasonable. The jury was
aware of Whoolery's contention that he fired certain
employees, including Daniel Gillen, Polosky, and
Immekus, because they committed fraud at First Capital.
Polosky denied at trial that he was terminated for

committing fraud at First Capital. (ECF No. 212 at 71-72, 99-100.)  The jury was apparently not convinced that Whoolery fired some employees because they committed fraud, or if it was, did not find that these incidents established Whoolery's innocence.  The jury's rejection of this defense, however, does not render Counsel's representation objectively unreasonable, or prejudicial. Whoolery makes no showing that more evidence about how he terminated these employees for committing fraud would have resulted in his acquittal.

     **(v)**       <u>**Evidentiary Stipulations**</u>

Whoolery argues that Counsel was ineffective because he stipulated to the admission of the government's exhibits, which included the loan files that Whoolery repeatedly contends in his § 2255 motion were incomplete. (ECF No. 376-4 at 82-91.) According to Whoolery, Counsel acted unreasonably by entering into this stipulation because the government's use of incomplete loan files at trial violated his constitutional rights and resulted in his wrongful conviction.

The court addressed Whoolery's contentions about the so-called incomplete loan files several times in this opinion. <u>See</u> <u>supra</u> Sections IV.A.1.a.ii. and iii., b.i(b), and c.ii. For the reasons previously explained, the jury could not have acquitted Whoolery on the ground that the loan files were missing certain documents, and therefore, this alleged

error cannot support Whoolery's ineffective assistance of counsel claim.  Whoolery was charged with, and convicted of, conspiracy to commit wire fraud.  The government had no duty to prove that any particular loan actually closed, or why it closed.  The government's duty was to prove that Whoolery agreed with another person to falsify appraisal or financial information on loan applications.  One of the ways that the government established that this conspiracy existed was to present documentary evidence, through qualifying witnesses, about the false information that was actually included on loan applications submitted by First Capital to lenders.  The crime, however, was the agreement.  The completeness of the loan files was not relevant to Whoolery's guilt or innocence.

In any event, the decision to enter evidentiary stipulations is a matter left to the discretion of counsel.  Defense counsel has the ultimate authority to decide issues concerning "what evidence should be introduced [and] what stipulations should be made[.]" Gov't of Virgin Islands v. Weatherwax, 77 F.3d 1425, 1434 (3d Cir. 1996) (omitting internal quotation marks and citation); see United States v. Benoit, 545 F. App'x 171, 174 (3d Cir. 2013).  The fact that Counsel discussed the status of the government's files with Whoolery prior to trial and objected to the government's discovery and evidence during pretrial proceedings does not make the decision to stipulate to the admissibility of the documents at trial unreasonable.  Having failed to secure traction towards a dismissal of the indictment on this basis, Counsel's decision to

stipulate to the admissibility of the files and challenge the government's case on other grounds was not objectively unreasonable.

Even if it was, the stipulation caused Whoolery no prejudice. Whoolery cannot show that the result of his trial would have been different if Counsel refused to enter this stipulation. Contrary to Whoolery's contentions that the documents would not have been admissible without the stipulation, the documents could have been admitted through the testimony of the borrowers to which the documents related, former First Capital employees familiar with the loan brokerage process, or third party representatives from the companies that produced documents to the government. Counsel still challenged the government's burden of proof at trial. This evidentiary stipulation did not prevent Counsel from mounting a defense, including on the grounds that some of the documents included forged signatures, the borrowers were aware of First Capital's fees prior to closing, and lenders did not actually rely upon the information set forth in the loan application in deciding whether to fund a loan. Counsel's stipulation had no effect on those arguments.

This aspect of Whoolery's ineffective assistance of counsel claim fails both Strickland prongs.

### d. Cumulative Effect of Errors

Whoolery's final contention with respect to his ineffective assistance of counsel claim is that the cumulative effect of all the errors identified in his motion resulted in his wrongful conviction. Because none of the errors advanced by Whoolery rise to the level

of a constitutional violation, there can be no cumulative effect of the errors to assess. In any event, even if errors occurred, Whoolery cannot establish that he would have been acquitted in their absence. The evidence of Whoolery's guilt at trial was overwhelming. Strickland, 466 U.S. at 695-96; Williams, 529 U.S. at 391; Baird, 312 F. App'x at 452; Jenkins, 333 F.3d at 155; Buehl, 166 F.3d at 181-82; accord Allen, 555 F.3d at 598.

## 2. **Governmental Misconduct**

Whoolery argues that the prosecutor engaged in numerous improper actions during this case, which the court refers to generally under the umbrella of governmental misconduct. Whoolery asserts four specific grounds for relief, one of which includes various subparts. (ECF No. 376-7.) The grounds for relief can be grouped into four categories:

> (1) Brady violation;
>
> (2) Prosecutorial Misconduct During Trial;
>
> (3) Selective Prosecution; and
>
> (4) Cumulative Effect of the Government's Misconduct.

As will be explained in detail below, Whoolery is not entitled to relief on any of these grounds.

### a. *Brady* **Violation**

Whoolery asserts that the government violated his due process rights in two ways: (1) by using incomplete loan files; and (2) by failing to disclose the loan files that cooperating witness Mark Hipsley provided to government investigators. (ECF No. 376-7

at 1-20.) With respect to both alleged violations, Whoolery contends that when Counsel and he reviewed the government's files prior to trial, the loan files made available to them were incomplete and did not include the three "closed loan files" given to the government by Hipsley. But on the first day of trial, "the government mysteriously had the ability to produce two (2) complete loan files," Id. at 5, and relied upon the missing Hipsley files during trial. Whoolery posits that the government had an undisclosed second room that housed the "withheld exculpatory evidence," consisting of the pages that were removed from the loan files before they were disclosed to him. (Id. at 10.) Whoolery explains that the missing items, such as the desktop underwriting findings, good faith estimates, truth in lending disclosures, mortgage brokerage business contracts, conventional underwriting decision forms, and loan registration/closing instructions, and the completed Hipsley files, were exculpatory because they established lender or borrower responsibility. (Id. at 5-6.) The government, in response, asserts that all loan file evidence was disclosed to Whoolery prior to trial, and that, regardless, Whoolery makes no showing that the allegedly withheld files contained materially exculpatory evidence. (ECF No. 394 at 34-35.)

As set forth earlier in this opinion, to establish that the prosecution's suppression of evidence constituted a due process violation under Brady, "a defendant must show: (1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment.'" United States v. Pelullo, 399 F.3d 197, 209 (3d Cir. 2005). Evidence is material if there is a

"reasonable probability" that, had the evidence been disclosed to the defense, the result of the underlying proceeding would have been different. <u>Strickler</u>, 527 U.S. at 280 (citing <u>Bagley</u>, 473 U.S. at 682). In <u>Brady</u>, the Supreme Court decided its first case in a long line of precedent that considered a prosecutor's duty to disclose evidence during the discovery phase of a criminal trial. <u>Brady</u>, 373 U.S. at 87. The Court in <u>Brady</u> held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution." <u>Id.</u> Due process requires that the prosecution produce all "exculpatory" evidence, which includes both "[m]aterials…that go to the heart of the defendant's guilt or innocence and materials that might affect the jury's judgment of the credibility of a crucial prosecution witness." <u>United States v. Ramos</u>, 27 F.3d 65, 68 (3d Cir. 1994) (quoting <u>United States v. Hill</u>, 976 F.2d 132, 134–35 (3d Cir. 1992)).

Whoolery contends that the allegedly missing loan file evidence would have led to his acquittal by proving that lenders and borrowers were responsible for deciding to close a loan, and borrowers were fully informed, prior to closing, of the fees being charged by First Capital. This court has previously explained, however, why documents such as truth in lending disclosures, underwriting findings, and mortgage broker contracts would not have been probative of Whoolery's innocence of the crime charged, i.e., conspiracy to commit wire fraud, and why a <u>Brady</u> violation could not have been asserted based on their nondisclosure. <u>See</u> <u>supra</u> Sections IV.A.1.a.ii. and iii., b.i(b), and c.i. Under these

circumstances, even accepting as true that the government failed to disclose compete loan files in its possession (a finding which this court does not affirmatively make),[16] it is impossible for Whoolery to establish the requisite "reasonable probability" that disclosing the evidence to the defense during discovery would have changed the result of the proceeding. <u>Bagley</u>, 473 U.S. at 682. For the reasons described previously, the loan files did not contain exculpatory or valuable impeachment evidence and their purported nondisclosure cannot form the basis of a <u>Brady</u> violation.

### b. **Prosecutorial Misconduct**

Whoolery identifies numerous examples of prosecutorial misconduct that occurred during trial, including that the government attorney:

(1) argued based upon evidence that was not in the record and incorrect law;

(2) allowed perjured testimony to be offered at trial;

(3) mislead the court about the requirements to secure a conviction;

(4) withheld exculpatory loan file documents; and

(5) informed the court that a conspiracy existed, but knew that it did not.

---

[16] Whoolery submits no factual support for his claims that the government withheld documents, including his baseless claims that the government admitted in opposition to his § 2255 motion that it engaged in such misconduct. By way of example only, Whoolery argues that the Hipsley files must have contained documents such as underwriting findings and truth in lending disclosures because Hipsley told the government that the files were removed from First Capital's "closed files" pile, which would have included the allegedly "missing" documents. (ECF No. 376-7 at 42.) Whoolery identifies no evidence that Counsel could have offered at trial to establish this fact. In any event, the summary of Hipsley's interview with the FBI indicates that the files provided to the government were from the "working files" pile, not the "closed files" pile at First Capital. (ECF No. 376-7 at 17; ECF No. 354-48.)

Whoolery argues that the government's misconduct permeated the entire trial, and, cumulatively, violated his constitutional rights. (ECF No. 376-7 at 21-47.) The court will address each allegation in turn below, but notes that none warrants relief in this case. Whoolery's challenges to the government's conduct in this regard are without merit.

Federal habeas relief may be granted when a prosecutor's conduct "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Foy v. Lamas, Crim. No. 12-088, 2013 WL 838191, at *28 (E.D. Pa. Mar. 6, 2013); Pursell v. Horn, 187 F.Supp.2d 260, 341 (W.D. Pa. 2002). To satisfy this standard, the prosecutor's misconduct must constitute a "'failure to observe the fundamental fairness essential to the very concept of justice.'" Donnelly, 416 U.S. 642 (quoting Lisenba v. Cal., 314 U.S. 219, 236 (1941)). The court must "examine the prosecutor's offensive actions in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001); see United States v. Young, 470 U.S. 1, 11 (1985).

### (i) Evidence not in the Record and Incorrect Law

Whoolery contends that his due process rights were violated because the prosecutor presented two theories to the jury that were not supported by any facts, and were contrary to law. (ECF No. 376-7 at 26.) These two allegedly improper theories were that a) unlicensed appraisers could not perform the underlying work on an appraisal and b) First Capital's fees were excessive and not disclosed to the borrowers. (Id.) In

response, the government notes that these were only two theories presented to the jury, out of many, and that, in any event, they were both supported by facts and the law. (ECF No. 394 at 36.) This court addressed both of these allegedly improper theories elsewhere in this opinion. <u>See</u> <u>supra</u> Sections IV.A.1.a.ii. and iii., b.1(b), c.ii. and iii(a). Despite Whoolery's insistence to the contrary, the appropriateness of using apprentice appraisers and the lawfulness of First Capital's fees were immaterial to Whoolery's defense.

As explained previously, the trial record contradicts any suggestion that Cowden or Baldwin were acting as apprentice appraisers when preparing appraisals for First Capital. The record instead reflects that the licensed appraisers did not review, supervise, or sign the appraisals submitted under their names, as is required by the Guidelines relied upon by Whoolery in support of his argument. Whoolery proffers no evidence with his § 2255 motion to suggest that the licensed individuals were involved in the appraisal process with Baldwin and Cowden such that an apprentice relationship could be established. As a result, the lawfulness of apprenticeships was not relevant to the instant case, making it impossible for the government's failure to inform the jury about the lawfulness of apprenticeships to have infected the trial with unfairness.

The fact that the government presented evidence about First Capital's fees likewise could not have infected the trial with unfairness. As explained previously, the government presented evidence about First Capital's fees in order to establish motive and intent to defraud. <u>See</u> <u>supra</u> Section IV.A.1.a.ii. and iii., and c.ii. The government's

presentation of evidence about the size and circumstances of First Capital's fees was proper in this context and did not infect the trial with unfairness.

Whoolery's due process rights were not violated by the government's presentation of either theory.

**(ii) <u>Perjured Testimony</u>**

Whoolery contends that the prosecutor engaged in misconduct by allowing Baldwin to present perjured testimony at trial about the time period during which she and Whoolery were not speaking. (ECF No. 376-7 at 28-31.) According to Whoolery, the prosecutor knew that Baldwin was lying about this timeline because the Clifford report indicates that First Capital was not licensed until 2002 and because government agents questioned Baldwin in December 2012 about inconsistencies in her testimony. (<u>Id.</u> at 30-31; ECF No. 354-51, -61.) The government responds that the incorporation or licensure date of First Capital does not establish that Baldwin's timeline testimony was false, and, in any event, there is no evidence that the government knew that Baldwin's testimony on this topic was intentionally incorrect. (ECF No. 394 at 37.)

The court previously addressed the Baldwin timeline issue in this opinion. <u>See</u> <u>supra</u> Section IV.A.1.c.i. Contrary to Whoolery's repeated insistence, none of the evidence identified by Whoolery proves that Baldwin lied about when she and Whoolery were not speaking. Documents reflecting that First Capital was created and licensed in 2002 are not evidence that Baldwin stopped speaking to Whoolery in 2003, instead of 2000 or 2001, as Baldwin contended at trial. The memorandum of interview relied upon,

but not cited to, by Whoolery in his briefing likewise does not prove that Baldwin lied about the timeline at trial. (ECF No. 376-7 at 30; ECF No. 354-61.)  That memorandum does not reflect any discussion with Baldwin about the formation of First Capital or the time period during which she was not speaking with Whoolery.  During the interview, Baldwin was confronted with inconsistencies in her testimony about time periods later in the conspiracy and about whether Baldwin used the appraisal license of Ronald Hall. This exhibit is, therefore, not probative that Baldwin gave false testimony at trial about when Whoolery and she were not speaking.

Whoolery cannot support his contention that the government knew that Baldwin would commit perjury at trial, yet called her as a witness.  Whoolery's prosecutorial misconduct claim on this ground is without any factual support or legal merit.

### (iii) Required Elements for Conviction

Whoolery contends that the prosecutor engaged in misconduct by arguing to the court during pretrial proceedings that complete loan files were not required in order to prosecute this case because the charged crime is a conspiracy to commit wire fraud, in which actual reliance is not required and materiality is defined as information that a reasonable lender could potentially rely upon. (ECF No. 376-7 at 33.)  According to Whoolery the U.S. Attorney Bulletin and this court's jury instructions establish that the prosecutor's statement of the law was wrong. (Id.)  The government, in response, states that it properly presented argument to the court about the elements of the conspiracy charged in this case, and did not engage in misconduct. (ECF No. 394 at 37.)

This court previously addressed the U.S. Attorney Bulletin in this opinion. See supra n.2. That document is not a training manual, as Whoolery contends, and does not discuss criminal conspiracies in which mortgage brokerage firms inflate appraisal values and falsify income information in order to secure loans on behalf of borrowers so that fees can be collected. Any references in that document to the kind of evidence needed to prove different kinds of mortgage fraud are therefore inapposite.

Contrary to Whoolery's contention, the court's jury instructions, which Whoolery concedes properly stated the law, actually establish that the prosecutor's argument about the elements of the charged conspiracy was substantively proper. The prosecutor's arguments and evidence were in accord with the court's statement of the law, and were proper. They, therefore, could not have infected Whoolery's trial with unfairness.

Whoolery's prosecutorial misconduct claim on this ground is unsupported.

### (iv) Exculpatory Loan Documents

Whoolery recharacterizes his Brady violation arguments as a prosecutorial misconduct argument. (ECF No. 376-7 at 39.) The court need not separately address the issue again and instead incorporates sections IV.A.1.a.ii. and iii., b.i(b), c.ii. as if fully restated here.

### (v) Existence of a Conspiracy

Whoolery claims that the prosecutor engaged in misconduct by continuing to allege that the conspiracy charged in the superseding indictment existed even though the evidence at trial disproved that Cowden used Gray's license on behalf of the Whoolery-

First Capital conspiracy, as was alleged in the indictment. (ECF No. 376-7 at 43-47.) Whoolery made a version of this same argument in connection with his ineffective assistance of counsel claim based upon Counsel's failure to request a single or multiple conspiracy jury instruction. See supra Section IV.A.1.b.i(a). In essence Whoolery contends that because Cowden used appraisal licenses other than Gray's license to advance the Whoolery-First Capital conspiracy, and because some employees of First Capital left in 2004 and formed their own mortgage brokerage firm, which also engaged in fraud, there was no Whoolery-First Capital conspiracy and the prosecutor engaged in misconduct by arguing that there was. For the same reasons that Whoolery's ineffective assistance of counsel claim on this basis fails, this prosecutorial misconduct claim fails.

The fact that Baldwin was the only individual to use Gray's licensure credentials to further the Whoolery-First Capital conspiracy does not disprove the existence of that conspiracy. The evidence established that Cowden used the licensure credentials of various other individuals to advance the Whoolery-First Capital conspiracy. The fact that some members of the Whoolery-First Capital conspiracy ventured out on their own after being members of the conspiracy does not disprove the existence of the Whoolery-First Capital conspiracy. See supra Section IV.A.1.b.i(a). It is not uncommon, or legally relevant, for members of a large conspiracy to come and go over time.

The prosecutor did not engage in misconduct by asking the jury to convict Whoolery for his participation in the Whoolery-First Capital conspiracy. Whoolery's claim to the contrary is without support in fact or law.

### c.  **Selective Prosecution**

Whoolery contends that his equal protection rights were violated because he was prosecuted for conspiracy to commit wire fraud, but Barry Baldwin was not. (ECF No. 376-7 at 48-56.)  According to Whoolery, Barry Baldwin was Kim Baldwin's coconspirator, not Whoolery, but the government refused to prosecute Barry Baldwin because he was a federal law enforcement agent and his conviction would have "opened a 'Pandora's Box' to many previous drug convictions." (ECF No. 376-7 at 49.)  The government characterizes this argument as "absurd" and explains that Barry Baldwin was not prosecuted because there was no evidence that he committed mortgage fraud, or any other crime. (ECF No. 394 at 39.)

A decision to prosecute is selective and violates the right to equal protection when it is made on a discriminatory basis with an improper motive. United States v. Schoolcraft, 879 F.2d 64, 68 (3d Cir. 1989).  To establish selective prosecution, a defendant must demonstrate both that: (1) persons similarly situated have not been prosecuted; and that (2) the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor, or to prevent the defendant from exercising a fundamental right. Id.  The defendant bears the burden of proof and must establish each of these elements with "clear evidence" sufficient to overcome the presumption of regularity that attaches to decisions to prosecute. United States v. Armstrong, 517 U.S. 456, 464 (1996).  Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, a motion

alleging a defect in the institution of the prosecution must be raised before trial. FED. R. CRIM. P. 12(b)(3)(A).

In support of his selective prosecution argument, Whoolery recounts numerous haphazard instances and occurrences that supposedly implicate Barry Baldwin in Kim Baldwin's fraud. Whoolery, with few exceptions, does not cite to the trial record or any exhibits attached to his § 2255 motion to support his litany of accusations. Whoolery's purported proof of Barry Baldwin's guilt includes a) Sheraw's allegations that Barry Baldwin threatened him when he mentioned Kim Baldwin's fraud to him, ECF No. 373-1, b) an unidentified check written by Barry Baldwin to an unidentified "coconspirator," c) Barry Baldwin's name being listed as an additional authorized representative on the P.O. Box registered by Kim Baldwin for her appraisal business, d) the purported incident in the fall of 2004 in which Whoolery confronted Barry Baldwin about Kim Baldwin's and Immekus' fraud and Barry Baldwin told him to mind his own business, and e) Barry Baldwin's refinance and short sale of his own home using a fraudulent appraisal. (ECF No. 376-7 at 48-56.) Putting aside the fact that Whoolery's accusations are offered almost entirely without supporting evidence, they still do not set forth a viable selective prosecution claim.

Even accepting Whoolery's accusations as true, they do not establish that Barry Baldwin was similarly situated to Whoolery. The incidents do not reflect that Barry Baldwin was associated with First Capital, or any other mortgage brokerage firm. The incidents do not establish that Barry Baldwin conspired to commit wire fraud by

submitting loan applications that contained false information to lenders over the course of several years.  The incidents, at most, implicate Barry Baldwin in the submission of a single inflated appraisal in connection with the refinancing of his own property, and reflect that he made intimidating statements in response to verbal attacks on his wife.  This conduct is not the same as directing a scheme at a mortgage brokerage firm that involved hundreds of fraudulent loans.  Whoolery and Barry Baldwin are not similarly situated.

With respect to the second prong of a selective prosecution claim, Whoolery fails to show that he received disparate treatment and that his prosecution was improperly motivated.  Whoolery does not set forth any facts to show that the decision to prosecute him, and not Barry Baldwin, was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor, or to prevent Whoolery from exercising a fundamental right. Schoolcraft, 879 F.2d at 68.  Whoolery's personal belief that his prosecution was improperly motivated is insufficient, and Whoolery does not otherwise point to clear evidence of a discriminatory intent or effect. Armstrong, 517 U.S. at 464.  Thus, Whoolery's selective prosecution claim is meritless.

### d.  **Cumulative Effect**

Because the government engaged in no misconduct, the court need not assess the alleged cumulative effect of the misconduct alleged by Whoolery.

**B. Motions for Reconsideration**

Whoolery filed two motions for reconsideration.  In one motion, Whoolery asks this court to reconsider its order allowing the government to file a supplemental response to his § 2255 motion after Whoolery's 450-page brief in support was properly docketed. (ECF No. 391.)  In the other motion, Whoolery asks this court to reconsider its order denying Whoolery's first motion for summary judgment and default judgment. (ECF No. 390.)  Both motions will be denied.

"Motions for reconsideration may be filed in criminal cases."  United States v. Fiorelli, 337 F.3d 282, 286 (3d Cir. 2003); United States v. Bennett, 514 F. App'x 151, 153-54 (3d Cir. 2013).  The purpose of a motion to reconsider is "to correct manifest errors of law or fact or to present newly discovered evidence." Bootay v. KBR, Inc., 437 F. App'x 140, 146-47 (3d Cir. 2011) (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)).  There are three circumstances in which a court may grant a motion for reconsideration: (1) there has been an intervening change in the law; (2) new evidence is now available that was not available when the court entered judgment; or (3) there is a need to correct a clear error of law or fact, or to prevent manifest injustice. Max's Seafood Café v. Quinteros, 176 F.3d 669, 667 (3d Cir. 1999) (cited by United States v. Trenk, No. 06-1004, 2009 WL 1298420, *2 (D.N.J. May 8, 2009)).  Whoolery does not acknowledge these standards, or indicate why he is entitled to relief under them.  Instead, Whoolery argues that the court made wrong decisions and should correct the mistakes now.  A motion for reconsideration, however, is not to be used to relitigate, or "rehash,"

136

issues the court already decided, or to ask a district court to rethink a decision it, rightly or wrongly, already made. Williams v. City of Pittsburgh, 32 F.Supp.2d 236, 238 (W.D. Pa. 1998); Reich v. Compton, 834 F.Supp. 753, 755 (E.D. Pa. 1993), aff'd in part, rev'd in part, 57 F.3d 270 (3d Cir. 1995); Keyes v. Nat'l R.R. Passenger Corp., 766 F.Supp. 277, 280 (E.D. Pa. 1991).

According to Whoolery, the court's "unsolicited" and "unrequested" decision to allow the government a "Second Bite at the Apple" was inappropriate and prejudicial. (ECF No. 391 at 1.) Whoolery contends that the government must have been aware of and in possession of his brief, regardless whether it appeared on the court's electronic docketing system, and should not have been given the opportunity to submit a second response to his motion to vacate. (Id.) The government's original response to Whoolery's § 2255 motion suggests that it was not in possession of Whoolery's voluminous brief at the time. (ECF No. 363 at 8, 9, 12.) Several times the government faults Whoolery for merely listing errors or misconduct without further explanation or detail. The further explanation was, of course, found in Whoolery's 450-page brief, which was not docketed by the clerk's office when the motion to vacate was filed. Upon becoming aware of the docketing error, the court arranged for the clerk's office to electronically file the brief on Whoolery's behalf, corrected the existing docket entries to appropriately title and link the previously-filed documents, and scheduled supplemental briefing during which both the government and Whoolery were given another opportunity to address the issues. (ECF No. 377.) Whoolery suffered no actual and

substantial prejudice as a result of the government being permitted to file a response to his motion to vacate after Whoolery's brief was docketed. Whoolery was given an opportunity to file a reply. Nothing was "manufactured" about this procedure, as Whoolery contends. (ECF No. 391 at 3.)

Although the supplemental briefing schedule required additional time for the government to respond to Whoolery's motion to vacate, this schedule did not ultimately result in any delay in the resolution of Whoolery's motion. Two months after the court entered the supplemental briefing schedule and only a week before the supplemental briefing would have been completed on February 8, 2016, Whoolery sought permission to amend his § 2255 motion to add an additional ground for relief. (ECF No. 397.) The court granted Whoolery's request, which was unopposed. (ECF No. 401.) Whoolery's amendment required that more briefing in connection with Whoolery's motion be scheduled. The final brief filed in connection with the pending § 2255 motion was Whoolery's reply brief to the government's response to his amendment, which was filed on April 4, 2016. (ECF No. 406.) Any delay in the disposition of this matter ultimately resulted from Whoolery's amendment, not from the docketing error and related supplemental briefing schedule.

The court of appeals "accord[s] district courts great deference with regard to matters of case management," Drippe v. Tobelinski, 604 F.3d 778, 783 (3d Cir. 2010), and "will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the

138

complaining litigant," <u>ZF Meritor, LLC v. Eaton Corp.</u>, 696 F.3d 254, 297 (3d Cir. 2012).

Whoolery is not entitled to relief because he suffered no prejudice when the court

scheduled supplemental briefing on his motion to vacate after the docketing error was

corrected. This motion for reconsideration will be denied.

Whoolery also filed a motion for reconsideration of this court's order denying his

first motion for summary judgment and motion for default judgment, in which he sought

an expedited ruling on the first two counts asserted in his motion to vacate, i.e., the

statute of limitations and the single versus multiple conspiracies arguments. (ECF No.

390.) In the opinion issued with that order, the court explained that Whoolery's motions

were denied because they were procedurally and legally improper. (ECF No. 378.)

Whoolery's motion for summary judgment was filed eight days after he filed his § 2255

motion, which consisted of a 454-page brief, 848-page appendix, and 65-page affidavit.

The government, within those eight days, had not responded to Whoolery's § 2255

motion, and, in fact, did not yet have a copy of Whoolery's 454-page brief in support

thereof.

Whoolery insists in his motion for reconsideration that he was entitled to summary

judgment and claims that the reasons given by the court for denying his motions were

"self-made procedural grounds" created by the court and "selectively applied" in order to

avoid having to immediately release him from jail. (ECF No. 390 at 2-3.) According to

Whoolery, once the motion was filed and a briefing schedule was entered, this court was

required to rule upon his motion for summary judgment.

Whoolery's contentions are meritless.  There is no obligation for the court to have managed this § 2255 proceeding in the manner preferred by Whoolery.   This court has discretion with regard to case management issues, provided they do not result in actual and substantial prejudice to the complaining litigant. <u>Drippe</u>, 604 F.3d at 783; <u>ZF Meritor</u>,  696 F.3d at 297.  Whoolery was not prejudiced by the court's procedures because, as set forth above, he was not then, and is not now, entitled to relief on either of the two grounds on which he sought judgment as a matter of law.  This motion for reconsideration will also be denied.

## V. <u>Need for an Evidentiary Hearing and Counsel</u>

For the reasons set forth above, petitioner's motion to vacate will be denied.  The motion, files, and records of this case show conclusively that petitioner failed to demonstrate that his trial counsel was ineffective or that there was any prosecutorial misconduct. 28 U.S.C. § 2255; <u>Booth</u>, 432 F.3d at 545-46.  Under these circumstances, there is no need to conduct an evidentiary hearing with respect to Whoolery's claims, and counsel need not be appointed in connection with these proceedings.

## VI. <u>Certificate of Appealability</u>

When a district court issues a final order denying a § 2255 motion, the court must also make a determination about whether a certificate of appealability ("COA") should issue or the clerk of the court of appeals shall remand the case to the district court for a prompt determination about whether a certificate should issue.  <u>See</u> 3rd Cir. LAR 22.2.

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA

> should issue when the petitioner shows, at least, that jurists of reason
> would find it debatable whether the petition states a valid claim of the
> denial of a constitutional right and that jurists of reason would find it
> debatable whether the district court was correct in its procedural ruling.

Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Based upon the motion, files and records this instant case, and for the reasons set forth herein, petitioner did not show a denial of his constitutional rights. A COA will not issue.

BY THE COURT:

Dated:   July 15, 2016 (as corrected 7/16/16)    /s/ *Joy Flowers Conti*

Joy Flowers Conti
Chief United States District Judge

cc:    Lewis Whoolery, 34634-068
       FCI Loretto, Federal Prison Camp
       P.O. Box 1000
       Loretto, PA  15940